1   Walter R. Lancaster (State Bar No. 244273)
    Rebecca J. Wahlquist (State Bar No. 215948)
2   KIRKLAND & ELLIS LLP
    777 South Figueroa Street
3   Los Angeles, California 90017
    Telephone: (213) 680-8400
4   Facsimile: (213) 680-8500
    wlancaster@kirkland.com
5   bwahlquist@kirkland.com

6   Counsel for Defendant
    ERNST & YOUNG LLP

7

8                 UNITED STATES DISTRICT COURT

9                 CENTRAL DISTRICT OF CALIFORNIA

10

11  CALIFORNIA PUBLIC EMPLOYEES'          )   CASE NO.
    RETIREMENT SYSTEM;                    )   CV08-03491 GPS
12  LOS ANGELES CITY EMPLOYEES'           )                    PLAx
    RETIREMENT SYSTEM;                    )
13  SOUTHWEST CARPENTERS PENSION          )
    TRUST;                                )
14  SHEET METAL WORKERS PENSION PLAN      )
    OF NORTHERN CALIFORNIA;               )
15  AMERICAN GENERAL LIFE AND             )
    ACCIDENT INSURANCE COMPANY;           )   NOTICE OF REMOVAL
16  AMERICAN GENERAL LIFE INSURANCE       )
    COMPANY;                              )
17  AIG ANNUITY INSURANCE COMPANY;        )
    AIG LIFE INSURANCE COMPANY;           )
18  AIG STRATEGIC BOND FUND;              )
    AMERICAN INTERNATIONAL LIFE           )
19  ASSURANCE COMPANY OF NEW YORK;        )
    AMERICAN INTERNATIONAL GROUP          )
20  RETIREMENT PLAN;                      )
    AIG US HIGH YIELD BOND FUND;          )
21  AIG US HIGH YIELD BOND FUND;          )
    BEATRICE HIGH YIELD CAYMAN UNIT       )
22  TRUST;                                )
    SEASONS SERIES TRUST STRATEGIC        )
23  BOND FUND;                            )
    VARIABLE ANNUITY LIFE INSURANCE       )
24  COMPANY II STRATEGIC BOND FUND;       )
    VARIABLE ANNUITY LIFE INSURANCE       )
25  COMPANY II HIGH YIELD BOND FUND;      )
    SUNAMERICA INCOME FUNDS HIGH          )
26  YIELD BOND FUND;                      )
    SUNAMERICA SERIES TRUST HIGH YIELD    )
27  BOND PORTFOLIO;                       )
    SUNMAMERICA INCOME FUNDS              )
28

FILED
2008 MAY 28 PM 1:24
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES
BY ___

COPY

STRATEGIC BOND FUND;
THE UNITED STATES LIFE INSURANCE
COMPANY;
AUTOMOTIVE INDUSTRIES PENSION
TRUST FUND;
ECLIPSE FUNDS INC.;
McMORGAN FUNDS;
NEW YORK LIFE INSURANCE AND
ANNUITY CORPORATION;
NEW YORK LIFE INSURANCE COMPANY;
NEW YORK LIFE INSURANCE COMPANY
HIGH YIELD SEPARATE ACCOUNT;
FINCH TACTICAL PLUS CLASS B;
ALTMA FUND SICA V PLC in respect of THE
GRAFTON SUB FUND;
CONTEXT ADVANTAGE MASTER FUND,
LP;
INSTITUTIONAL BENCHMARKS SERIES
(MASTER FEEDER) LIMITED in respect of
ALCOR SERIES;
WORLDWIDE TRANSACTIONS LIMITED;
LEHMAN BROTHERS FIRST TRUST
INCOME OPPORTUNITY FUND INC.;
LEHMAN BROTHERS ALPHA FUNDS PLC
for LEHMAN BROTHERS U.S. HIGH YIELD
FUND;
LEHMAN BROTHERS HIGH YIELD BOND
FUND LLC;
NEUBERGER BERMAN ADVISERS
MANAGEMENT TRUST for LEHMAN
BROTHERS HIGH INCOME BOND FUND;
LEHMAN BROTHERS INCOME FUNDS for
LEHMAN BROTHERS HIGH INCOME BOND
FUND;
LEHMAN BROTHERS INCOME FUNDS for
LEHMAN BROTHERS STRATEGIC INCOME
FUND;
NEUBERGER BERMAN INCOME
OPPORTUNITY FUND, INC.;
AUTOMOBILE CLUB INSURANCE
ASSOCIATION;
GM CANADA FOREIGN TRUST;
GMAM INVESTMENT FUNDS TRUST;
MOTORS INSURANCE CORPORATION;
PLUMBERS & PIPEFITTERS NATIONAL
PENSION FUND;
ATRIUM IV;
ATRIUM V;
CASTLE GARDEN FUNDING;
MADISON PARK FUNDING II, LTD.;
MADISON PARK FUNDING III, LTD.;
CSAM FUNDING I, LTD.;
CREDIT SUISSE SYNDICATED LOAN FUND;
CREDIT SUISSE HIGH YIELD FUND;
SEI INSTITUTIONAL MANAGED TRUST –
HIGH YIELD BOND FUND;
SEI INSTITUTIONAL INVESTMENTS TRUST

– HIGH YIELD BOND FUND;
SEI GLOBAL MASTER FUND – HIGH YIELD
BOND FUND;
STICHTING PENSIOENFONDS METAAL EN
TECHNIEK;
GENERAL MOTORS WELFARE BENEFITS
TRUST;
THE NATURE CONSERVANCY;
STICHTING BEDRIJFSTAKPENSIOENFONDS
VOOR DE METALEKTRO;
ALASKA RETIREMENT MANAGEMENT
BOARD;
BOWSPRIT OFFSHORE LTD.;
ING (L) SELECTED STRATEGIES SICA V -
HIGH YIELD SUB FUND; HIGH YIELD
COMMON TRUST; HIGH YIELD
COLLECTIVE TRUST;
DELAWARE GROUP EQUITY FUNDS I -
DELAWARE BALANCED FUND;
DELAWARE GROUP INCOME FUNDS -
DELAWARE DELCHESTER FUND;
DELAWARE GROUP ADVISER FUNDS -
DELAWARE DIVERSIFIED INCOME FUND;
DELAWARE POOLED TRUST - THE HIGH
YIELD BOND PORTFOLIO;
DELAWARE GROUP INCOME FUNDS -
DELAWARE HIGH-OPPORTUNITIES FUND;
OPTIMUM FUND TRUST - OPTIMUM FIXED
INCOME FUND;
DELAWARE VIP TRUST - DELAWARE VIP
DIVERSIFIED INCOME SERIES; DELAWARE
VIP TRUST - DELAWARE VIP HIGH YIELD
SERIES; DELAWARE INVESTMENTS
DIVIDEND AND INCOME FUND, INC.;
DELAWARE GROUP EQUITY FUNDS V -
DELAWARE DIVIDEND INCOME FUND; and
DELAWARE INVESTMENTS GLOBAL
DIVIDEND AND INCOME FUND, INC.,

   Plaintiffs,

  v.

WACHOVIA CAPITAL MARKETS, LLC d/b/a
WACHOVIA SECURITIES;
ERNST & YOUNG LLP; and
BDO SEIDMAN, LLP,

   Defendants.

-3-

1        **PLEASE TAKE NOTICE** that, on this date, defendant Ernst & Young
2    LLP ("E&Y"), by its undersigned counsel, files this Notice of Removal pursuant to
3    28 U.S.C. § 1452, removing this matter (the "California Action") from the Superior
4    Court of the State of California, County of Los Angeles to the United States District
5    Court for the Central District of California.  This Court has original jurisdiction over
6    this case pursuant to 28 U.S.C. § 1334.
7          In support of this Notice of Removal, E&Y states as follows:
8    **The Complaint**
9
10   1.       On April 28, 2008, 75 Plaintiffs, former holders of 9% Senior Subordinated
11   Notes issued by the now bankrupt Le-Nature's, Inc. (the "Notes"), commenced a civil
12   action in Superior Court of the State of California, County of Los Angeles.  Plaintiffs
13   seek over $70 million in alleged compensatory damages, as well as punitive damages
14   and pre-judgment and post-judgment interest.  The Complaint asserts eleven causes of
15   action against one or more Defendants, including multiple claims for (a) fraud, (b)
16   aiding and abetting fraud, (c) negligent misrepresentation, (d) fraudulent inducement,
17   and (e) fraudulent failure to correct.  (A copy of the Complaint is attached as Exhibit
18   A to the Declaration of Rebecca J. Wahlquist, dated 5/28/08   ("Wahlquist Decl."),
19   filed herewith.)
20   2.       Le-Nature's, Inc., a Delaware corporation headquartered in Latrobe,
21   Pennsylvania, as well as its wholly-owned subsidiaries, Le-Nature's Holdings, Inc.
22   and Tea Systems International, LLC, are currently in Chapter 11 bankruptcy
23   proceedings, pending in the United States Bankruptcy Court for the Western District
24   of Pennsylvania.  *See In re Le-Nature's, Inc.*, Case Nos. 06-25454-MBM, 06-25590-
25   MBM, 06-25591-MBM) (W.D. Pa. 2006) ("Bankruptcy Proceedings").
26   ***Grounds for Removal***
27   3.       Title 28 U.S.C. § 1452(a) permits a party to remove any claim or cause of
28   action "to the district court for the district where such civil action is pending, if such

district court has jurisdiction of such claim or cause of action under section 1334 of this title." 28 U.S.C. § 1452(a).

4.      Section 1334 provides the district court with jurisdiction to hear all civil proceedings that are "related to" cases under the Bankruptcy Code. 28 U.S.C. § 1334(b). "Related to" jurisdiction is construed broadly to encompass "nearly every matter directly or indirectly related to the bankruptcy." *In re Mann*, 907 F.2d 923, 926 n.4 (9th Cir. 1990).

5.      A civil proceeding is "related to" bankruptcy if the "***the outcome of the proceeding could conceivably have any effect on the estate being administered in bankruptcy***." *In re Fietz*, 852 F.2d 455, 457 (9th Cir. 1988) (*quoting Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984) (emphasis in original)). Thus, a proceeding may be "related to" a bankruptcy even if it does not involve claims against the debtor or against the debtor's property. *Id.*

6.      Further, an "action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankruptcy estate." *In re Am. Hardwoods, Inc.*, 885 F.2d 621, 623 (9th Cir. 1989) (*quoting In re Fietz*, 852 F.2d at 457).

7.      Plaintiffs' claims are "related to" the Le-Nature's ongoing Bankruptcy Proceedings in the following ways:

        a.      The California Action necessarily affects the Debtor's liabilities and obligations, as well as the administration of the Le-Nature's estate in bankruptcy. More than a year before filing this lawsuit, at least fourteen of the 75 Plaintiffs filed claims in the Bankruptcy Proceedings to recover the same losses related to the Notes that they are claiming in this litigation. Those Plaintiffs are:

- Delaware VIP Diversified Income Series (Compl. ¶ 87, Ex. A to Wahlquist Decl.);
- Delaware VIP High Yield Series (*id.* ¶ 88);
- Delaware Delchester Fund (*id.* ¶ 82);

- Delaware High-Yield Opportunities Fund (*id.* ¶ 85);

- Delaware Group Adviser Funds on behalf of the Delaware Diversified Income Fund (*id.* ¶ 83);

- Delaware Investments Dividend & Income Fund, Inc. (*id.* ¶ 89);

- Delaware Investments Global Dividend & Income Fund, Inc. (*id.* ¶ 91);

- Delaware Group Equity Funds I on behalf of the Delaware Balanced Fund (*id.* ¶ 81);

- Delaware Pooled Trust High Yield Bond Portfolio (*id.* ¶ 84);

- New York Life Insurance Company (*id.* ¶ 42);

- New York Life Insurance Company High Yield Separate Account (*id.* ¶ 43);

- New York Life Insurance and Annuity Corporation (*id.* ¶ 41);

- Automotive Industries Pension Trust Fund (*id.* ¶ 38); and

- Sheet Metal Workers Pension Plan of Northern California (*id.* ¶ 20).

(A copy of each of these Plaintiffs' Proof of Claims is attached as Exhibits B–I to Wahlquist Declaration.)[1]

    b.  In the Bankruptcy Proceedings, each of the fourteen Plaintiffs asserts "claims against the Debtor" made "under both federal and state law, relating to the Notes," including "***any and all claims for breach of contract, fraud, fraudulent inducement, fraudulent misrepresentation and negligent misrepresentation with respect to the Debtor's statements and conduct, including***," without limitation, the Debtor's covenants, representations, warranties and other obligations and duties

---

[1] In addition to the fourteen entities listed above, seven AIG-affiliated Plaintiffs—AIG Annuity Insurance Company (Compl. ¶ 23, Ex. A to Wahlquist Decl.), AIG Life Insurance Company (*id.* ¶ 24), AIG Strategic Bond Fund Ireland (*id.* ¶ 25), American International Life Assurance Company of New York (*id.* ¶ 26), American International Group Retirement Plan (*id.* ¶ 27), AIG US High Yield Bond Fund (Japan) (*id.* ¶ 28), and AIG US High Yield Bond Fund (Ireland) (*id.* ¶ 29)— apparently filed claims on the Notes through AIG Global Investment Corporation "as investment adviser or subadviser for certain funds and accounts." (AIG Global Investment Corp. Proof of Claim Form at Rider to Proof of Claim, dated March 20, 2007, attached as Ex. J to Wahlquist Decl.) The Proof of Claim asserts that the AIG-affiliated entities "purchased certain publicly-traded bonds and notes due 2013 (the 'Notes') issued by Debtors"—*i.e.*, the Notes at issue in the California Action—and specifies that the Proof of Claim encompasses "all loss or damage arising from [the AIG-affiliated entities'] investment in and sale of the Notes, subject to any part of this claim that may have been transferred to another entity." (*Id.* ¶¶ 1, 11)

1   contained in the Indenture, ***the Notes and any documents relating thereto***." (Exs. B–

2   I to Wahlquist Decl. (emphasis added))

3       c. If Plaintiffs recover in the California Action, in whole or in part, for

4   the losses they allegedly suffered from their ownership of the Notes, that recovery

5   would necessarily reduce or eliminate Le-Nature's' liabilities on the claims filed by

6   the fourteen Plaintiffs in the Bankruptcy Proceedings. *See Pan Pacific Retail Props.,*

7   *Inc. v. Gulf Ins. Co.*, 471 F.3d 961, 973–74 (9th Cir. 2006) (a party does not have the

8   "right to recover twice for the same loss").  Because any recovery by Plaintiffs in this

9   litigation would directly alter the Debtor's liabilities in the Bankruptcy Proceedings,

10   the outcome of this litigation has much more than a "conceivable effect" on the Le-

11   Nature's bankruptcy.  The California Action's effect on Le-Nature's' liabilities on the

12   Notes is therefore more than sufficient to establish federal jurisdiction under 28

13   U.S.C. § 1334.  *See In re Kaonohi Ohana, Ltd.,* 873 F.2d 1302, 1307 (9th Cir. 1989)

14   (upholding "related to" jurisdiction where plaintiff's success in third-party action

15   would reduce debtor's exposure in separate breach of contract action); *see also In re*

16   *Celotex Corp.,* 124 F.3d 619, 626 (4th Cir. 1997) (finding "related to" jurisdiction

17   where creditor's claim against non-debtor would reduce creditor's claim in

18   bankruptcy, altering debtor's liabilities).

19       d. By reducing or eliminating recovery in the Bankruptcy Proceedings

20   by the fourteen Plaintiffs who filed claims on the Notes, any recovery by Plaintiffs in

21   this litigation would increase the recovery of other creditors in the Bankruptcy

22   Proceedings.  Simply put, if Plaintiffs recover anything in this litigation, then Le-

23   Nature's' remaining creditors will be entitled to a larger share of Le-Nature's'

24   remaining assets.  This Court therefore has "related to" jurisdiction not only because

25   recovery in the California Action would alter the Debtor's liabilities to the fourteen

26   Plaintiffs, but also because recovery in this action would impact the bankruptcy

27   estate's handling and administration of the claims of other creditors.  *See In re*

28   *Canion,* 196 F.3d 579, 586 (5th Cir. 1999) ("related to" jurisdiction exists over

plaintiff-creditor's state court claims against non-debtors because recovery by plaintiff-creditor would reduce the amount due on its claims in bankruptcy, "to the benefit of all other unsecured creditors, each of whom would then share in the disbursement that would otherwise have been paid to [plaintiff-creditor]").

        e. Moreover, certain of the Defendants in this lawsuit are creditors of Le-Nature's in the Bankruptcy Proceedings. Defendant Wachovia Capital Markets, LLC ("Wachovia") has asserted claims of more than $282 million on its own behalf and on behalf of other lenders to Le-Nature's for whom Wachovia is administrative agent, in connection with a September 1, 2006 Secured Credit Agreement. (*See* Wachovia Bankruptcy Claim, dated 3/16/07, Ex. K to Wahlquist Decl.)   In addition, BDO Seidman LLP ("BDO") is listed as a creditor in the bankruptcy, for more than $100,000 of unpaid fees. (*See* Le-Nature's Inc. Bankruptcy Schedules, dated 1/8/07, Ex. L to Wahlquist Decl.) If Plaintiffs prevail on their claims in the Complaint against Wachovia and BDO, then Wachovia's claim and BDO's recovery as a creditor could be equitably subordinated to the claims of other creditors. *See Stoumbos v. Kilimnik,* 988 F.2d 949, 958 (9th Cir. 1993) (citations omitted); 11 U.S.C. § 510(c).   Such equitable subordination could re-prioritize distributions by the Debtor—reducing the likelihood that Wachovia and BDO would recover anything on their claims in bankruptcy, while increasing the likelihood of recovery by creditors whose claims are currently subordinated to those of Wachiovia and BDO.   Thus, in this respect as well, the California Action could "alter the debtor's rights [and] liabilities" and impact "the handling and administration of the bankruptcy estate." *In re Am. Hardwoods, Inc.,* 885 F.2d at 623.

        f. Accordingly, this action is "related to" the Bankruptcy Proceedings, and removal is proper under 28 U.S.C. § 1452.

**Timeliness**

8.      E&Y has timely filed this notice of removal within thirty (30) days of service of the Complaint in accordance with 28 U.S.C. § 1446(b) and Fed. R. Bankr.

P. 9027(a)(3).   E&Y waived service of process and received the Complaint in this action on April 28, 2008.  No other pleadings or process have been filed in the state court.

**Non-Core**

As required by Fed. R. Bankr. P. 9027(a)(1), E&Y states that the claims asserted against it are non-core within the meaning of 28 U.S.C. § 157(b).  E&Y does not consent to the entry of final orders or judgment by the bankruptcy judge.

WHEREFORE, E&Y respectfully requests that this Court accept this notice of removal and grant it such other and further relief as the Court deems just and proper.


DATED:  May 28, 2008

By: _Becca Wahlquist_
Walter R. Lancaster
Rebecca J. Wahlquist
KIRKLAND & ELLIS LLP
777 South Figueroa Street
Los Angeles, California 90017
Telephone: (213) 680-8400
Facsimile: (213) 680-8500

*Of Counsel*
Emily Nicklin, P.C.
Gabor Balassa
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois 60601
Telephone: (312) 861-2000
Facsimile: (312) 861-2200

Counsel for ERNST & YOUNG LLP

# EXHIBIT A

1    QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
     John B. Quinn (Bar No. 090378)
2    johnquinn@quinnemanuel.com
     Bruce E. Van Dalsem (Bar No. 124128)
3    brucevandalsem@quinnemanuel.com
     David E. Azar (Bar No. 218319)
4    davidazar@quinnemanuel.com
     865 South Figueroa Street, 10th Floor
5    Los Angeles, California  90017-2543
     Telephone:    (213) 443 3000
6    Facsimile:    (213) 443 3100

7    Attorneys for Plaintiffs

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

APR 2 8 2008

John A. Clarke, Executive Officer/Clerk

By:_____, Deputy
D.M. SWAIN

8            SUPERIOR COURT OF THE STATE OF CALIFORNIA

9               COUNTY OF LOS ANGELES

10

11    CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT
     SYSTEM;
12    LOS ANGELES CITY EMPLOYEES' RETIREMENT
     SYSTEM;
13    SOUTHWEST CARPENTERS PENSION TRUST;
     SHEET METAL WORKERS PENSION PLAN OF
14    NORTHERN CALIFORNIA;
     AMERICAN GENERAL LIFE AND ACCIDENT
15    INSURANCE COMPANY;
     AMERICAN GENERAL LIFE INSURANCE
16    COMPANY;
     AIG ANNUITY INSURANCE COMPANY;
17    AIG LIFE INSURANCE COMPANY;
     AIG STRATEGIC BOND FUND;
18    AMERICAN INTERNATIONAL LIFE ASSURANCE
     COMPANY OF NEW YORK;
19    AMERICAN INTERNATIONAL GROUP
     RETIREMENT PLAN;
20    AIG US HIGH YIELD BOND FUND;
     AIG US HIGH YIELD BOND FUND;
21    BEATRICE HIGH YIELD CAYMAN UNIT TRUST;
     SEASONS SERIES TRUST STRATEGIC BOND FUND;
22    VARIABLE ANNUITY LIFE INSURANCE COMPANY
     II STRATEGIC BOND FUND;
23    VARIABLE ANNUITY LIFE INSURANCE COMPANY
     II HIGH YIELD BOND FUND;
24    SUNAMERICA INCOME FUNDS HIGH YIELD BOND
     FUND;
25    SUNAMERICA SERIES TRUST HIGH YIELD BOND
     PORTFOLIO;
26    SUMAMERICA INCOME FUNDS STRATEGIC BOND
     FUND;
27    THE UNITED STATES LIFE INSURANCE COMPANY;
     AUTOMOTIVE INDUSTRIES PENSION TRUST
28    FUND;

Case No.   BC389785

**COMPLAINT FOR FRAUD, FRAUDULENT INDUCEMENT, AIDING AND ABETTING FRAUD, & NEGLIGENT MISREPRESENTATION**

**JURY TRIAL DEMANDED**

**Trial Date:**    **None Set**

COPY

Exhibit A
Page 10

ECLIPSE FUNDS INC.;
McMORGAN FUNDS;
NEW YORK LIFE INSURANCE AND ANNUITY
CORPORATION;
NEW YORK LIFE INSURANCE COMPANY;
NEW YORK LIFE INSURANCE COMPANY HIGH
YIELD SEPARATE ACCOUNT;
FINCH TACTICAL PLUS CLASS B;
ALTMA FUND SICAV PLC in respect of THE
GRAFTON SUB FUND;
CONTEXT ADVANTAGE MASTER FUND, LP;
INSTITUTIONAL BENCHMARKS SERIES (MASTER
FEEDER) LIMITED in respect of ALCOR SERIES;
WORLDWIDE TRANSACTIONS LIMITED;
LEHMAN BROTHERS FIRST TRUST INCOME
OPPORTUNITY FUND INC.;
LEHMAN BROTHERS ALPHA FUNDS PLC for
LEHMAN BROTHERS U.S. HIGH YIELD FUND;
LEHMAN BROTHERS HIGH YIELD BOND FUND
LLC;
NEUBERGER BERMAN ADVISERS MANAGEMENT
TRUST for LEHMAN BROTHERS HIGH INCOME
BOND FUND;
LEHMAN BROTHERS INCOME FUNDS for LEHMAN
BROTHERS HIGH INCOME BOND FUND;
LEHMAN BROTHERS INCOME FUNDS for LEHMAN
BROTHERS STRATEGIC INCOME FUND;
NEUBERGER BERMAN INCOME OPPORTUNITY
FUND INC.;
AUTOMOBILE CLUB INSURANCE ASSOCIATION;
GM CANADA FOREIGN TRUST;
GMAM INVESTMENT FUNDS TRUST; MOTORS
INSURANCE CORPORATION;
PLUMBERS & PIPEFITTERS NATIONAL PENSION
FUND;
ATRIUM IV;
ATRIUM V;
CASTLE GARDEN FUNDING;
MADISON PARK FUNDING II, LTD.;
MADISON PARK FUNDING III, LTD.;
CSAM FUNDING I, LTD.;
CREDIT SUISSE SYNDICATED LOAN FUND;
CREDIT SUISSE HIGH YIELD FUND;
SEI INSTITUTIONAL MANAGED TRUST – HIGH
YIELD BOND FUND;
SEI INSTITUTIONAL INVESTMENTS TRUST – HIGH
YIELD BOND FUND;
SEI GLOBAL MASTER FUND – HIGH YIELD BOND
FUND;
STICHTING PENSIOENFONDS METAAL EN
TECHNIEK;
GENERAL MOTORS WELFARE BENEFITS TRUST;
THE NATURE CONSERVANCY;
STICHTING BEDRIJFSTAKPENSIOENFONDS VOOR

1   DE METALEKTRO;
2   ALASKA RETIREMENT MANAGEMENT BOARD;
    BOWSPRIT OFFSHORE LTD.;
3   ING (L) SELECTED STRATEGIES SICAV - HIGH
    YIELD SUB FUND; HIGH YIELD COMMON TRUST;
4   HIGH YIELD COLLECTIVE TRUST;
    DELAWARE GROUP EQUITY FUNDS I -
5   DELAWARE BALANCED FUND;
    DELAWARE GROUP INCOME FUNDS - DELAWARE
6   DELCHESTER FUND;
    DELAWARE GROUP ADVISER FUNDS -
7   DELAWARE DIVERSIFIED INCOME FUND;
    DELAWARE POOLED TRUST - THE HIGH YIELD
8   BOND PORTFOLIO;
    DELAWARE GROUP INCOME FUNDS - DELAWARE
9   HIGH-OPPORTUNITIES FUND;
    OPTIMUM FUND TRUST - OPTIMUM FIXED
10  INCOME FUND;
    DELAWARE VIP TRUST - DELAWARE VIP
11  DIVERSIFIED INCOME SERIES; DELAWARE VIP
    TRUST - DELAWARE VIP HIGH YIELD SERIES;
12  DELAWARE INVESTMENTS DIVIDEND AND
    INCOME FUND, INC.;
13  DELAWARE GROUP EQUITY FUNDS V -
    DELAWARE DIVIDEND INCOME FUND; and
14  DELAWARE INVESTMENTS GLOBAL DIVIDEND
    AND INCOME FUND, INC.,
15
                    Plaintiffs,
16
        -against-
17
    WACHOVIA CAPITAL MARKETS, LLC d/b/a
18  WACHOVIA SECURITIES;
    ERNST & YOUNG LLP; and
19  BDO SEIDMAN, LLP,
20
                    Defendants.
21
22          Plaintiffs, by their attorneys Quinn Emanuel Urquhart Oliver & Hedges, LLP, for

23  their Complaint against Defendants Wachovia Capital Markets, LLC d/b/a Wachovia Securities

24  ("Wachovia"), Ernst & Young LLP ("E&Y"), and BDO Seidman, LLP ("BDO," and collectively

25  with Wachovia and E&Y, the "Defendants"), allege as follows:

26

27

28

COMPLAINT

## TABLE OF CONTENTS

1

2                                                                                                                 **Page**

3   PRELIMINARY STATEMENT................................................................................ 1

4   PARTIES, JURISDICTION, AND VENUE........................................................... 7

5      Plaintiffs ....................................................................................................... 7

6      Defendants................................................................................................... 16

7      Selected Relevant Non-Parties ................................................................... 16

8      Venue ........................................................................................................... 17

9   BACKGROUND ................................................................................................. 17

10     History of Le Nature's:  A Rapid Rise and Dramatic Fall............................ 17

11     The Beginning of Wachovia's Symbiotic Relationship  with Le Nature's:
           Transactions in 2003 ..............................................................................22
12
       The First Step:  April 2003 Credit Facility ................................................. 23
13
       Wachovia Breaks Further into the High Yield Market with the June 2003 Note
14         Offering ...................................................................................................23

15     The Offering Memorandum ......................................................................... 26

16     The Contemporaneous June 2003 Credit Facility ...................................... 27

17     E&Y's Woeful Audits Mislead the Noteholders........................................ 28

18     The Events of July 2003:  Le Nature's' Key Financial Managers Identify Fraud at
           the Company ............................................................................................37
19
       E&Y Does Not Correct Its Faulty Audits After the CFO Identifies Fraud ....... 40
20
       Wachovia's Origination Division Continues to Brush Aside Evidence of Fraud
21         After the CFO's Abrupt Resignation .......................................................44

22     Wachovia's Relationship With Le Nature's Intensifies After the 2003 Resignations ........45

23     Wachovia's Knowledge of Le Nature's' Fraud Becomes Even Clearer Before Le
           Nature's' Demise .................................................................................... 48
24
       Wachovia Publishes a Series of Misleading, Knowingly False Research Reports
25         Touting Le Nature's as a Sound Investment .......................................... 52

26     Fully Aware of the Fraud, Wachovia Completes Yet Another Credit Facility for Le
           Nature's, Thereby Earning Even More Fees and Reducing Its Own Exposure ........ 57
27
       BDO's Audits Further Assist Le Nature's' Fraudulent Fund Raising Efforts .................. 59
28

COMPLAINT

| | | |
|---|---|---|
| 1 | The Noteholders Sell Their Notes at Massive Losses | 69 |
| 2 | FIRST CAUSE OF ACTION - Against Wachovia for Fraud | 70 |
| 3 | SECOND CAUSE OF ACTION - Against Wachovia for Aiding and Abetting Fraud | 72 |
| 4 | THIRD CAUSE OF ACTION - Against Wachovia for Negligent Misrepresentation | 74 |
| 5 | FOURTH CAUSE OF ACTION - Against Wachovia for Fraudulent Inducement | 76 |
| 6 | FIFTH CAUSE OF ACTION - Against E&Y for Fraud | 77 |
| 7 | SIXTH CAUSE OF ACTION - Against E&Y for Fraud/Failure to Correct | 79 |
| 8 | SEVENTH CAUSE OF ACTION - Against E&Y for Aiding and Abetting Fraud | 82 |
| 9 | EIGHTH CAUSE OF ACTION - Against E&Y for Negligent Misrepresentation | 83 |
| 10 | NINTH CAUSE OF ACTION - Against BDO for Fraud | 86 |
| 11 | TENTH CAUSE OF ACTION - Against BDO for Aiding and Abetting Fraud | 88 |
| 12 | ELEVENTH CAUSE OF ACTION - Against BDO for Negligent Misrepresentation | 90 |
| 13 | PRAYER FOR RELIEF | 93 |

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Exhibit A**
**Page 14**

COMPLAINT

## PRELIMINARY STATEMENT

1.    Le Nature's, Inc. ("Le Nature's" or the "Company"), a beverage manufacturer, bottler, and distributor based in Latrobe, Pennsylvania, orchestrated a massive and now widely acknowledged fraud that led to the Company's bankruptcy and ultimate demise. For the year 2005, Le Nature's reported net sales of over $275 million. As a court-appointed custodian discovered, however, Le Nature's' actual revenues were as little as *$32 million*. On November 1, 2006, just after the public revelation of Le Nature's' fraud, a group of Le Nature's' creditors placed the Company in involuntary bankruptcy. Not long thereafter, the Company ceased operations altogether. The chapter 11 trustee, following further investigation, has determined that Le Nature's' revenues in 2005 were just *$28.2 million.*

2.    Le Nature's' massive revenues inflation, which was accompanied by overstated and false profit reports, had gone on for years – a fact confirmed by the chapter 11 trustee. The Company had long been reporting sales numbers that had no relation whatsoever to its actual results. Indeed, as early as 2000, the Company was reporting revenues in excess of $32 million, a number that it approached only years later, after the Company's production capacity was substantially enhanced with the introduction of a new facility in Phoenix, Arizona. For many years prior to completion of the Phoenix facility, the Company falsely reported revenues *well in excess of its 2005 post-expansion revenues.* The extent of the overstatement is startling:

1

COMPLAINT



3.     In June 2003, several years after the Company commenced its false revenue reports, Le Nature's issued $150 million of 9% Senior Subordinated Notes (the "Notes," and holders thereof, the "Noteholders") (the "Note Offering"). The Note Offering was underwritten and arranged by Wachovia Securities, LLC (operations that, on information and belief, are now part of Wachovia). To induce investors to purchase the Notes, the offering materials materially overstated Le Nature's' revenues and profits, wrongfully making it appear that the Company was a thriving, growing enterprise. To the contrary, even in 2003, the Company was hobbling along, surviving from year to year only by rapidly and repeatedly increasing its level of borrowings.

4.     Wachovia drafted the misleading offering materials for Le Nature's, and orchestrated sales pitches to potential investors, even though its primary investment banker on the Le Nature's deal knew that the Company was hampered by severe management integrity issues. Grant Rice, the Wachovia banker in charge of the relationship, came to Wachovia from Bank of America shortly before the Note Offering. Rice was aware that Bank of America, which considered arranging a transaction for Le Nature's, ultimately refused to do so when it learned of management's suspect practices. Undeterred, however, Rice moved the Le Nature's relationship to Wachovia, where he and his new colleagues seized the opportunity to work with Le Nature's in

1   order to build up Wachovia's fledgling high-yield debt business, to garner substantial fees for

2   Wachovia, and to bring in a client that would require multiple financings in successive years.

3          5.      Indeed, Wachovia's own sales division, having been warned that Le Nature's'

4   management was untrustworthy, resisted the Note Offering, and raised a series of questions to its

5   investment banking counterpart within Wachovia.  The sales division knew that it would be called

6   upon to respond to investor inquiries when Le Nature's fell apart.  The investment bankers,

7   however, pushed the deal through, telling their colleagues within Wachovia simply to trust them

8   and not to raise further questions.

9          6.      Wachovia's participation in the Le Nature's fraud was not limited to arranging and

10  marketing the Note Offering.  Rather, over the following several years, Wachovia repeatedly

11  issued market analysis reports assigning an "outperform" rating to Le Nature's – thereby

12  indicating that it was a solid company and a good investment.  By issuing these reports, Wachovia

13  was able to maintain a high and stable market price for Le Nature's bonds.  But Wachovia knew

14  its reports were wrong.

15         7.      From before the Note Offering until the demise of Le Nature's, Wachovia was a

16  trusted advisor and confidant to the Company and its executives, and secured tens of millions of

17  dollars in fees over those years by structuring, underwriting, syndicating, and managing (both

18  directly and through its affiliates) at least six Le Nature's bank facilities and securities issuances.

19  Together with Le Nature's' management, Wachovia also engaged in extensive efforts, over several

20  years, to sell the Company, a process through which Wachovia's investment bankers learned even

21  more details about the Company's fraudulent reporting and management practices.  For many

22  years, Wachovia served as Le Nature's' facilitator and arranger for all major financial

23  undertakings.

24         8.      Among other things, Wachovia knew – but hid from the Noteholders and the bond

25  market – that (i) almost immediately following issuance of the Notes, Le Nature's convened a

26  special committee to investigate the sudden resignation of the Company's chief financial officer

27  and other senior financial managers, who left the Company because of the fraud being committed

28  by the CEO and other executives, resulting in a report identifying serious issues with the

1   Company's financial reporting and with the CEO's unchecked control over *all* of the Company's

2   operations, (ii) Le Nature's systematically had been unable to make timely interest payments on its

3   bank credit facilities, a fact that Wachovia hid by having its affiliate bank covertly front the

4   payments for Le Nature's, (iii) Le Nature's was reporting sales data that could not possibly be

5   accurate based on information readily available to, but purposefully ignored by, Wachovia, (iv) Le

6   Nature's' management was habitually dismissive of requests for information and disregarded

7   specific mandates to improve accounting, inventory, and other financial safeguards, (v) Le

8   Nature's' products were being pulled from the shelves at retailers, and (vi) in 2005, Le Nature's

9   improperly recorded more than $200 million in capital leases as operating leases, thereby

10  removing these massive liabilities from its balance sheet.  Wachovia knew that Le Nature's was

11  engaging in fraud.  But none of this information, all of which was material and known to

12  Wachovia, was disclosed to the Noteholders or the bond market.

13          9.      Wachovia knew that, had the real situation at Le Nature's – i.e., its dire financial

14  state and corrupt management – been revealed from the outset, the Note Offering never could have

15  been completed.  And, had Wachovia been honest in its post-offering disclosures, the price of the

16  Notes would have plummeted.  But Wachovia had a strong motivation to hide the true facts, and

17  thereby to artificially maintain the inflated price of the Notes.  By hiding the true state of affairs at

18  Le Nature's, Wachovia was able to perpetuate the Company's existence, as well as its constant

19  demand for cash infusions, thereby ensuring ever increasing fees for Wachovia from (i) arranging

20  and syndicating multiple new credit facilities for Le Nature's, and (ii) marketing the Company for

21  sale to a third-party investor.  Wachovia also used Le Nature's to bolster its high-yield debt

22  resumé, further breaking into a market in which Wachovia had been struggling to obtain exposure.

23          10.     Wachovia was not alone in defrauding, and in assisting Le Nature's to defraud, the

24  Noteholders.  E&Y, Le Nature's' purportedly independent outside auditor at the time of the Note

25  Offering, issued clean audit opinions for Le Nature's' 2000, 2001, and 2002 financial statements,

26  even though those statements dramatically overstated the Company's revenues, profits, and

27  inventories.  In issuing its audit report, E&Y improperly relied on the Company's internal

28  controls, even though E&Y knowingly failed to perform any testing of certain critical controls.

**Exhibit A**
**Page 18**

1 And E&Y failed to perform any substantive testing on crucial elements of the financial statements,

2 including revenues and expenses, enabling fraudulent misrepresentation of the most important

3 aspects of financial performance. E&Y confirmed, for example, bulk tea inventories that were

4 overstated by more than *2800%*, even though E&Y knew about the suspicious nature of Le

5 Nature's' tea purchases and sales, and the segregation of these operations from the Company's

6 core beverage business.

7      11.    There can be no question that the Noteholders relied upon, and that E&Y

8 specifically intended them to rely upon, the audit report. The audited financials – together with

9 E&Y's report – were appended directly to the Offering Memorandum used to market the Notes.

10 Simply put, E&Y's audit report was part of the marketing package.

11      12.    E&Y compounded the misrepresentations included in its audit report by knowingly

12 failing to rescind or correct the report after Le Nature's' chief financial officer resigned and a

13 special committee issued a report identifying fraudulent conduct in the very areas that E&Y

14 reviewed in issuing its audit opinions. Indeed, the CFO spoke with the head of E&Y's audit team

15 when he resigned, and the two discussed the fraudulent activity at Le Nature's. E&Y knew that its

16 audit report contained false statements, and it knew that the statements were false at the time the

17 report was issued, but it failed to advise the Noteholders that the audit opinions were flawed and

18 that the financial statements included in the Offering Memorandum were materially misstated.

19      13.    After the abrupt departure of Le Nature's' chief financial officer in August 2003,

20 BDO stepped in as Le Nature's' outside auditor. Continuing the course charted by E&Y, BDO

21 confirmed financial statements for the years 2003, 2004, and 2005 that materially overstated Le

22 Nature's' revenues and profits, and materially understated the Company's liabilities and expenses.

23 For the year ended 2005, for example, BDO issued a clean audit opinion to accompany Le

24 Nature's' financial statements – the very statements that falsely reflected net sales in excess of

25 $275 million (nearly ten times the sales levels determined by the court-appointed custodian and

26 the chapter 11 trustee). BDO also assisted Le Nature's in misclassifying its massive capital lease

27 obligations as operating leases, thereby keeping more than $200 million of liabilities off the

28

1  Company's balance sheet, and in hiding rental expenses for production equipment, thereby further

2  overstating the Company's net income.

3       14.    Over the course of five audit years, E&Y and BDO ignored numerous glaring red

4  flags demonstrating Le Nature's' falsification efforts, assisted in the inflation of assets and

5  misclassification of liabilities, and issued reports – which they knew the Noteholders would rely

6  upon – confirming and validating the misstated results.  The stamps of approval issued by these

7  major auditing firms were key components of the fraud perpetrated on the Noteholders.

8       15.    As a result of the fraud perpetrated by Le Nature's, its executives, Wachovia, and

9  the two auditing firms, the Notes were substantially overpriced from the day of their issuance in

10  June 2003 until the public revelation of the Company's fraud at the outset of November 2006.

11  Immediately upon disclosure of the fraud, the Notes tumbled in value, causing the immediate loss

12  of the vast majority of the Noteholders' investments.  Each Plaintiff in this action purchased the

13  Notes, either as an initial purchaser when the Notes were first issued or otherwise before the

14  public revelation of the fraud.  Many of the Plaintiffs purchased their Notes directly from

15  Wachovia.  All Plaintiffs paid par value – or more – for their Notes.  All Plaintiffs ultimately sold

16  their notes at substantially lower prices after Le Nature's was forced into bankruptcy.  As a result,

17  Plaintiffs suffered, and Defendants should be held liable for, aggregate losses in excess of $70

18  million.

19       16.    Many of the Defendants in this action already have produced documents to the

20  chapter 11 trustee and other parties in connection with the Le Nature's bankruptcy proceedings.

21  Those documents provide further details regarding Defendants' fraudulent activities.  The

22  allegations in this Complaint, however, are not based on documents produced in the bankruptcy

23  cases that have been designated as "confidential" by the producing parties.  When those

24  documents become available for use in this proceeding, Plaintiffs will amend this Complaint to

25  provide further details regarding Defendants' knowledge and conduct.

26

27

28

6

**Exhibit A**
**Page 20**

PARTIES, JURISDICTION, AND VENUE

**Plaintiffs**

17.     California Public Employees' Retirement System ("CalPERS") is a public pension plan organized under the laws of California.  CalPERS sold its notes on or about November 1, 2006 at a loss.

18.     Los Angeles City Employees' Retirement System is a California public pension fund that purchased Notes on or about February 10, 2006.  Los Angeles City Employees' Retirement System sold its Notes on or about November 1, 2006 at a loss.

19.     Southwest Carpenters Pension Trust is a California pension plan that purchased Notes on or about October 21, 2005, December 22, 2005, April 11, 2006, July 19 and 25, 2006, and August 24, 2006.  Southwest Carpenters Pension Trust sold its Notes on or about November 1, 2006 at a loss.

20.     Sheet Metal Workers Pension Plan of Northern California is a trust that purchased Notes on or about November 7, 2003 and February 15, 2005.  Sheet Metal Workers Pension Plan of Northern California sold its Notes on or about November 9 and 10, 2006 at a loss.

21.     American General Life and Accident Insurance Company is a Tennessee corporation that purchased Notes on or about June 3, 2005.  American General Life and Accident Insurance Company sold its Notes on or about November 1, 2 and 6, 2006 at a loss.

22.     American General Life Insurance Company is a Texas corporation that purchased Notes on or about June 3, 2005, April 26, 2006, May 2 and 4, 2006, June 2, 2006, July 28, 2006, and September 6, 2006.  American General Life Insurance Company sold its Notes on or about November 1, 2 and 6, 2006 at a loss.

23.     AIG Annuity Insurance Company is a Texas corporation that purchased Notes on or about June 3, 2005, April 26, 2006, May 2 and 4, 2006, and June 2, 2006.  AIG Annuity Insurance Company sold its Notes on or about November 1,2 and 6, 2006 at a loss.

24.     AIG Life Insurance Company is a Delaware corporation that purchased Notes on or about June 3, 2005.  AIG Life Insurance Company sold its Notes on or about November 1, 2 and 6, 2006 at a loss.

1      25.    AIG Strategic Bond Fund is an Irish UCITS[1] that purchased Notes on or about

2  June 2, 2006. AIG Strategic Bond Fund sold its Notes on or about November 1 and 6, 2006 at a

3  loss.

4      26.    American International Life Assurance Company of New York is a New York

5  corporation that purchased Notes on or about April 26, 2006, May 2 and 4, 2006, June 2, 2006,

6  and September 6, 2006. American International Life Assurance Company of New York sold its

7  Notes on or about November 1, 2 and 6, 2006 at a loss.

8      27.    American International Group Retirement Plan is a Delaware corporation that

9  purchased Notes on or about June 3, 2005, May 2 and 4, 2006, June 2, 2006, and September 6,

10  2006. American International Group Retirement Plan sold its Notes on or about November 1, 2

11  and 6, 2006 at a loss.

12      28.    AIG US High Yield Bond Fund is a Japanese commingled trust that purchased

13  Notes on or about June 3, 2005 and May 2, 2006. AIG US High Yield Bond Fund sold its Notes

14  on or about November 2 and 6, 2006 at a loss.

15      29.    AIG US High Yield Bond Fund is an Irish UCITS that purchased Notes on or about

16  March 27, 2006. AIG US High Yield Bond Mother Fund sold its Notes on or about November 1,

17  2 and 6, 2006 at a loss.

18      30.    Beatrice High Yield Cayman Unit Trust is a Cayman Islands unit trust that

19  purchased Notes on or about May 2 and 4, 2006 and September 6, 2006. Beatrice High Yield

20  Cayman Unit Trust sold its Notes on or about November 1, 2 and 6, 2006 at a loss.

21      31.    Seasons Series Trust Strategic Bond Fund is a Massachusetts business trust that

22  purchased Notes on or about October 14 and 18, 2005 and June 2, 2006. Seasons Series Trust

23  Strategic Bond Fund sold its Notes on or about November 1, 2 and 6, 2006 at a loss.

24      32.    Variable Annuity Life Insurance Company II Strategic Bond Fund is a Delaware

25  business trust that purchased Notes on or about June 3, 2005, October 14 and 18, 2005, and

26

27

---

28  [1]  UCITS is an acronym for Undertakings for Collective Investment in Transferable
Securities.

COMPLAINT

1  June 2, 2006.  Variable Annuity Life Insurance Company II Strategic Bond Fund sold its Notes on

2  or about November 1, 2 and 6, 2006 at a loss.

3        33.    Variable Annuity Life Insurance Company II High Yield Bond Fund is a Delaware

4  business trust that purchased Notes on or about June 3, 2005, October 14 and 18, 2005, and

5  June 2, 2006.  Variable Annuity Life Insurance Company II High Yield Bond Fund sold its Notes

6  on or about November 1, 2 and 6, 2006 at a loss.

7        34.    SunAmerica Income Funds High Yield Bond Fund is a Massachusetts business

8  trust that purchased Notes on or about June 3, 2005 and October 14 and 18, 2005.  SunAmerica

9  Income Funds High Yield Bond Fund sold its Notes on or about November 1, 2 and 6, 2006 at a

10 loss.

11       35.    SunAmerica Series Trust High Yield Bond Portfolio is a Massachusetts business

12 trust that purchased Notes on or about June 3, 2005 and October 14 and 18, 2005.  SunAmerica

13 Series Trust High Yield Bond Portfolio sold its Notes on or about November 1, 2 and 6, 2006 at a

14 loss.

15       36.    SunAmerica Income Funds Strategic Bond Fund is a Massachusetts business trust

16 that purchased Notes on or about June 3, 2005, October 14 and 18, 2005, and June 2, 2006.

17 SunAmerica Income Funds Strategic Bond Fund sold its Notes on or about November 1, 2 and 6,

18 2006 at a loss.

19       37.    The United States Life Insurance Company is a New York corporation that

20 purchased Notes on or about April 26, 2006, May 2 and 4, 2006, June 2, 2006, and September 6,

21 2006.  The United States Life Insurance Company sold its Notes on or about November 1, 2 and 6,

22 2006 at a loss.

23       38.    Automotive Industries Pension Trust Fund is a trust that purchased Notes on or

24 about May 20, 2004 and February 15, 2005.  Automotive Industries Pension Trust Fund sold its

25 Notes on or about November 9 and 10, 2006 at a loss.

26       39.    Eclipse Funds Inc. is a Maryland corporation that purchased Notes on or about

27 February 10, 2006.  Eclipse Funds Inc. sold its Notes on or about November 9 and 10, 2006 at a

28 loss.

COMPLAINT

**Exhibit A**
**Page 23**

1    40.    McMorgan Funds is a Delaware business trust that purchased Notes on or about

2  November 7, 2003, May 20, 2004, February 15, 2005, and February 10, 2006.  McMorgan Funds

3  sold its Notes on or about November 9 and 10, 2006 at a loss.

4    41.    New York Life Insurance and Annuity Corporation is a Delaware corporation that

5  purchased Notes on or about June 18 and 19, 2003, November 7, 2003, May 20, 2004, and

6  February 10, 2006.  New York Life Insurance and Annuity Corporation sold its Notes on or about

7  November 9 and 10, 2006 at a loss.

8    42.    New York Life Insurance Company is a New York mutual life insurance company

9  that purchased Notes on or about June 18 and 19, 2003, May 20, 2004, and February 10, 2006.

10  New York Life Insurance Company sold its Notes on or about November 9 and 10, 2006 at a loss.

11    43.    New York Life Insurance Company High Yield Separate Account is a New York

12  insurance separate account that purchased Notes on or about October 7, 2003, May 20, 2004, and

13  February 15, 2005.  New York Life Insurance Company High Yield Separate Account sold its

14  Notes on or about November 9 and 10, 2006 at a loss.

15    44.    Finch Tactical Plus Class B is a Cayman Islands corporation that purchased Notes

16  on or about April 18, 2006.  Finch Tactical Plus Class B sold its Notes on or about April 25, 2007

17  and May 2, 2007 at a loss.

18    45.    ALTMA Fund SICAV PLC in respect of The Grafton Sub Fund is a Malta

19  corporation that purchased Notes on or about April 18, 2006.  ALTMA Fund SICAV PLC in

20  respect of The Grafton Sub Fund sold its Notes on or about April 25, 2007 and May 2, 2007 at a

21  loss.

22    46.    Context Advantage Master Fund, LP is a Cayman Islands limited partnership that

23  purchased Notes on or about April 18, 2006.  Context Advantage Master Fund, LP sold its Notes

24  on or about April 25, 2007 and May 2, 2007 at a loss.

25    47.    Institutional Benchmarks Series (Master Feeder) Limited in respect of Alcor Series

26  is a Bermuda corporation that purchased Notes on or about April 18, 2006.  Institutional

27  Benchmarks Series (Master Feeder) Limited in respect of Alcor Series sold its Notes on or about

28  April 25, 2007 and May 2, 2007 at a loss.

10

COMPLAINT

1      48.    Worldwide Transactions Limited is a Cayman Islands corporation that purchased

2  Notes on or about April 18, 2006. Worldwide Transactions Limited sold its Notes on or about

3  April 25, 2007 and May 2, 2007 at a loss.

4      49.    Lehman Brothers First Trust Income Opportunity Fund Inc. is a Delaware business

5  trust that purchased Notes on or about February 10, 2006. Lehman Brothers First Trust Income

6  Opportunity Fund Inc. sold its Notes on or about November 1, 2006 at a loss.

7      50.    Lehman Brothers Alpha Funds PLC for Lehman Brothers U.S. High Yield Fund is

8  an Irish UCITS that purchased Notes on or about May 9, 2006. Lehman Brothers Alpha Funds

9  PLC for Lehman Brothers U.S. High Yield Fund sold its Notes on or about November 1, 2006 at a

10  loss.

11      51.    Lehman Brothers High Yield Bond Fund LLC is a Delaware limited liability

12  corporation that purchased Notes on or about February 10, 2006 and August 29, 2006. Lehman

13  Brothers High Yield Bond Fund LLC sold its Notes on or about November 1, 2006 at a loss.

14      52.    Neuberger Berman Advisers Management Trust for Lehman Brothers High Income

15  Bond Fund is a Delaware business trust that purchased Notes on or about July 31, 2006 and

16  August 29, 2006. Neuberger Berman Advisers Management Trust for Lehman Brothers High

17  Income Bond Fund sold its Notes on or about November 1, 2006 at a loss.

18      53.    Lehman Brothers Income Funds for Lehman Brothers High Income Bond Fund is a

19  Delaware business trust that purchased Notes on or about July 31, 2006 and August 29, 2006.

20  Lehman Brothers Income Funds for Lehman Brothers High Income Bond Fund sold its Notes on

21  or about November 1, 2006 at a loss.

22      54.    Lehman Brothers Income Funds for Lehman Brothers Strategic Income Fund is a

23  Delaware business trust that purchased Notes on or about July 31, 2006 and August 29, 2006.

24  Lehman Brothers Income Funds for Lehman Brothers Strategic Income Fund sold its Notes on or

25  about November 1, 2006 at a loss.

26      55.    Neuberger Berman Income Opportunity Fund Inc. is a Maryland corporation that

27  purchased Notes on or about February 10, 2006 and August 29, 2006. Neuberger Berman Income

28  Opportunity Fund Inc. sold its Notes on or about November 1, 2006 at a loss.

1     56.    Automobile Club Insurance Association is a Michigan Corporation that purchased

2    Notes on or about February 10, 2006.  Automobile Club Insurance Association sold its Notes on

3    or about November 1, 2006 at a loss.

4     57.    GM Canada Foreign Trust is an Ontario trust that purchased Notes on or about

5    February 10, 2006.  GM Canada Foreign Trust sold its Notes on or about November 1, 2006 at a

6    loss.

7     58.    GMAM Investment Funds Trust is a New York trust that purchased Notes on or

8    about February 10, 2006.  GMAM Investment Funds Trust sold its Notes on or about November 1,

9    2006 at a loss.

10     59.    Motors Insurance Corporation is a Michigan corporation that purchased Notes on

11   or about February 10, 2006.  Motors Insurance Corporation sold its Notes on or about November

12   1, 2006 at a loss.

13     60.    Plumbers & Pipefitters National Pension Fund is a Unites States multi-employer

14   defined benefit fund that purchased Notes on or about February 10, 2006.  Plumbers & Pipefitters

15   National Pension Fund sold its Notes on or about November 1, 2006 at a loss.

16     61.    Atrium IV is a Cayman Islands corporation that purchased Notes on or about

17   January 18, 2006 and October 5, 2006.  Atrium IV sold its Notes on or about November 1, 2006 at

18   a loss.

19     62.    Atrium V is a Cayman Islands corporation that purchased Notes on or about July

20   28, 2006 and September 5, 2006.  Atrium V sold its Notes on or about November 1, 2006 at a loss.

21     63.    Castle Garden Funding is a Cayman Islands corporation that purchased Notes on or

22   about December 1, 2005 and January 18, 2006.  Castle Garden Funding sold its Notes on or about

23   November 1, 2006 at a loss.

24     64.    Madison Park Funding II, Ltd. is a Cayman Islands corporation that purchased

25   Notes on or about May 31, 2006 and October 5, 2006.  Madison Park Funding II, Ltd. sold its

26   Notes on or about November 1, 2006 at a loss.

27

28

12

COMPLAINT

1    65.    Madison Park Funding III, Ltd. is a Cayman Islands corporation that purchased

2  Notes on or about October 5, 2006.  Madison Park Funding III, Ltd. sold its Notes on or about

3  November 1, 2006 at a loss.

4    66.    CSAM Funding I, Ltd., is a Cayman Islands corporation that purchased Notes on or

5  about January 18, 2006.  CSAM Funding I sold its Notes on or about November 1, 2006 at a loss.

6    67.    Credit Suisse Syndicated Loan Fund is an Australian investment trust that

7  purchased Notes on or about September 19 and 22, 2005.  Credit Suisse Syndicated Loan Fund

8  sold its Notes on or about November 1, 2006 at a loss.

9    68.    Credit Suisse High Yield Fund is an Australian investment trust that purchased

10  Notes on or about June 13, 2005 and December 1, 2005.  Credit Suisse High Yield Fund sold its

11  Notes on or about November 1, 2006 at a loss.

12    69.    SEI Institutional Managed Trust – High Yield Bond Fund is a Massachusetts

13  business trust that purchased Notes on or about December 22, 2005 and July 19 and 25, 2006.  SEI

14  Institutional Managed Trust – High Yield Bond Fund sold its Notes on or about November 1, 2006

15  at a loss.

16    70.    SEI Institutional Investments Trust – High Yield Bond Fund is a is a Massachusetts

17  business trust that purchased Notes on or about November 12, 2003, December 1 and 5, 2003,

18  February 2, 2004, April 27, 2004, June 3 and 17, 2004, October 21, 2005, December 22, 2005, and

19  July 19 and 25, 2006.  SEI Institutional Investments Trust – High Yield Bond Fund sold its Notes

20  on or about November 1, 2006 at a loss.

21    71.    SEI Global Master Fund – High Yield Bond Fund is an Irish limited liability

22  investment company that purchased Notes on or about September 22, 2005, October 21, 2005,

23  April 11, 2006, July 19 and 25, 2006, and August 24, 2006.  SEI Global Master Fund – High Yield

24  Bond Fund sold its Notes on or about November 1, 2006 at a loss.

25    72.    Stichting Pensioenfonds Metaal en Techniek is a Netherlands pension plan that

26  purchased Notes on or about July 1, 2003, March 30, 2004, October 21, 2004, and July 19 and 25,

27  2006.  Stichting Pensioenfonds Metaal en Techniek sold its Notes on or about November 1, 2006

28  at a loss.

1    73.    General Motors Welfare Benefits Trust is a Michigan trust that purchased Notes on

2  or about January, 3, 2005, October 21, 2005, December 22, 2005, July 19 and 25, 2006, and

3  August 29, 2006.  General Motors Welfare Benefits Trust sold its Notes on or about November 1,

4  2006 at a loss.

5    74.    The Nature Conservancy is a District of Columbia non-profit corporation that

6  purchased Notes on or about December 1 and 5, 2003.  The Nature Conservancy sold its Notes on

7  or about November 1, 2006 at a loss.

8    75.    Stichting Bedrijfstakpensioenfonds voor de Metalektro is a Netherlands pension

9  plan that purchased Notes on or about December 1 and 5, 2003, February 2, 2004, March 31,

10  2004, April 27, 2004, January 3, 2005, September 22, 2005, December 22, 2005, April 11, 2006,

11  July 19 and 25, 2006, and August 29, 2006.  Stichting Bedrijfstakpensioenfonds voor de

12  Metalektro sold its Notes on or about November 1, 2006 at a loss.

13    76.    The Alaska Retirement Management Board is the fiduciary of the assets of the

14  Alaska Public Employees Retirement System and the Alaska Teachers Retirement System.  The

15  Alaska Retirement Management Board purchased Notes on or about April 18, 2005, December 22,

16  2005, April 11, 2006, July 19 and 25, 2006, and August 24, 2006.  The Alaska Retirement

17  Management Board sold its Notes on or about November 1, 2006 at a loss.

18    77.    Bowsprit Offshore Ltd. is a British Virgin Islands corporation that purchased Notes

19  on or about June 18, 2003, December 5, 2003, and June 3, 2004.  Bowsprit Offshore Ltd. sold its

20  Notes on or about November 1, 2006 at a loss.

21    78.    ING (L) Selected Strategies SICAV - High Yield Sub Fund is a Luxemburg UCITS

22  that purchased Notes on or about February 20, 2004, April 18, 2005, December 22, 2005, April

23  11, 2006, July 19 and 25, 2006, and August 24, 2006.  ING (L) Selected Strategies SICAV - High

24  Yield Sub Fund sold its Notes on or about November 1, 2006 at a loss.

25    79.    High Yield Common Trust is a Connecticut trust fund that purchased Notes on or

26  about October 21, 2005, December 22, 2005, April 11, 2006, and August 24, 2006.  High Yield

27  Common Trust sold its Notes on or about November 1, 2006 at a loss.

28

Exhibit A
Page 28

COMPLAINT

80.     High Yield Collective Trust is a Connecticut trust fund that purchased Notes on or about October 21, 2005, December 22, 2005, April 11, 2006,  July 19 and 25, 2006, and August 24, 2006.  High Yield Collective Trust sold its Notes on or about November 1, 2006 at a loss.

81.     Delaware Group Equity Funds I - Delaware Balanced Fund is a Delaware statutory trust that sold its Notes on about November 29, 2006, and December 4, 2006 at a loss.

82.     Delaware Group Income Funds - Delaware Delchester Fund is a Delaware statutory trust that sold its Notes on or about November 29, 2006, and December 4, 2006 at a loss.

83.     Delaware Group Adviser Funds - Delaware Diversified Income Fund is a Delaware statutory trust that sold its Notes on or about November 29, 2006, and December 4, 2006 at a loss.

84.     Delaware Pooled Trust - The High Yield Bond Portfolio is a Delaware statutory trust that sold its Notes on or about November 29, 2006, and December 4, 2006 at a loss.

85.     Delaware Group Income Funds - Delaware High Yield Opportunities Fund is a Delaware statutory trust that sold its Notes on or about November 29, 2006, and December 4, 2006 at a loss.

86.     Optimum Fund Trust - Optimum Fixed Income Fund is a Delaware statutory trust that sold its Notes on or about November 29, 2006, and December 4, 2006 at a loss.

87.     Delaware VIP Trust - Delaware VIP Diversified Income Series is a Delaware statutory trust that sold its Notes on or about November 29, 2006, and December 4, 2006 at a loss.

88.     Delaware VIP Trust - Delaware VIP High Yield Series is a Delaware statutory trust that sold its Notes on or about November 29, 2006, and December 4, 2006 at a loss.

89.     Delaware Investments Dividend and Income Fund, Inc., is a Maryland corporation that sold its Notes on or about November 29, 2006 at a loss.

90.     Delaware Group Equity Funds V – Delaware Dividend Income Fund is a Delaware statutory trust that sold its Notes on or about November 29, 2006, and December 4, 2006 at a loss.

91.     Delaware Investments Global Dividend and Income Fund, Inc., is a Maryland corporation that sold its Notes on or about November 29, 2006 at a loss.

**Defendants**

92.     Wachovia is a Delaware limited liability company that conducts substantial business and maintains an office in California.  According to its website, Wachovia offers "debt and equity underwriting, trading, research and sales, loan syndications agent services, and corporate finance and M&A advisory services."  Wachovia provides these services under the trade name "Wachovia Securities," which is the trade name for all of the corporate and investment banking services of Wachovia Corporation and its subsidiaries (including Wachovia Capital Markets, LLC).  At all times relevant to this Complaint, Wachovia was the principal investment banker and financial advisor to Le Nature's, and it arranged, promoted, and performed other services in connection with multiple credit facilities and securities issuances for Le Nature's, totaling hundreds of millions of dollars.  Wachovia arranged, promoted, and underwrote the Note Offering specifically at issue in this action.

93.     E&Y is a Delaware limited liability partnership that conducts substantial business in, has partners located in, and maintains several offices in California.  E&Y was Le Nature's' outside accountant and auditor for the year 2002, and was retained to re-audit Le Nature's' financial statements for the years 2000 and 2001.  Accordingly, E&Y issued an audit report with respect to Le Nature's' financial statements for the years ended December 31, 2000, 2001 and 2002.

94.     BDO is a New York limited liability partnership that conducts substantial business in, has partners in, and maintains several offices in California.  BDO was Le Nature's' outside accountant and auditor for the years 2003 through 2006, and issued audit reports with respect to Le Nature's' financial statements for the years ended December 31, 2003, 2004, and 2005.

**Selected Relevant Non-Parties**

95.     Le Nature's is a Delaware corporation with its principal place of business in Latrobe, Pennsylvania.  Le Nature's was in the business of manufacturing, bottling, and distributing an array of non-carbonated beverages.  Le Nature's was placed in involuntary bankruptcy on November 1, 2006.

1       96.    Gregory J. Podlucky ("Podlucky") is an individual who resides in Pennsylvania.

2   At all times relevant hereto, he was the majority and controlling shareholder of Le Nature's and its

3   Chairman and Chief Executive Officer.

4       97.    Robert Lynn ("Lynn") is an individual who resides in Pennsylvania.   At all times

5   relevant hereto, he was an Executive Vice President of Le Nature's and was Podlucky's nominee

6   to, and a member of, Le Nature's' Board of Directors.

7       98.    Jonathan Podlucky ("Jonathan Podlucky"), the brother of Gregory Podlucky, is an

8   individual who resides in Pennsylvania.   At all times relevant hereto, he was the Chief Operating

9   Officer of Le Nature's and was Podlucky's nominee to, and a member of, Le Nature's' Board of

10   Directors.

11       99.    Andrew Murin ("Murin") is an individual who resides in Pennsylvania.   At all

12   times relevant hereto, he was Podlucky's nominee to, and a member of, Le Nature's' Board of

13   Directors.  Podlucky, Lynn, Jonathan Podlucky, and Murin are referred to collectively as the "Le

14   Nature's Executives."

15   **Venue**

16       100.    Venue is proper here as all Defendants maintain offices here and both E&Y and

17   BDO have identified addresses within Los Angeles County for service of process within the state

18   of California.

19                           **BACKGROUND**

20   **History of Le Nature's:  A Rapid Rise and Dramatic Fall**

21       101.    Le Nature's was founded by Podlucky in 1989 and produced its first product – a

22   carbonated flavored water called Le*Nature's Sparkler – in 1992.  Within a year, the Company

23   expanded its line of products to include iced teas, lemonades, and a juice-based line of drinks

24   called Dazzlers.  By 2005, the Company claimed to be producing nearly 60 different non-

25   carbonated beverage products.

26       102.    Le Nature's styled itself an innovator in the beverage industry and touted its alleged

27   use of cutting-edge technologies and distribution methods.  In the 1990s, Le Nature's purported to

28   be one of the first beverage companies to move its products into environmentally safer PET plastic

Exhibit A

Page 31

COMPLAINT

1  bottles, to patent a method by which beverages could be pasteurized in the bottle itself, and to

2  develop new technologies for brewing iced tea. Indeed, Le Nature's described itself as having

3  "one of America's most advanced beverage manufacturing facilities."

4    103.    According to its annual financial statements, public pronouncements, and

5  marketing materials, Le Nature's was a remarkably successful company. The growth in its array

6  of products was purportedly coupled with even more impressive growth in its gross sales, net

7  sales, and profits. The year-to-year increases in financial performance were purportedly as

8  follows:

9  
| Year | Reported Gross Sales | Reported Net Sales | Reported Net Income |
|------|----------------------|--------------------|---------------------|
| 2000* | $40,658,000 | $40,405,000 | $953,000 |
| 2001* | $85,094,000 | $83,961,000 | $1,350,000 |
| 2002 | $143,766,705 | $135,650,095 | $9,458,809 |
| 2003 | $179,905,164 | $155,746,687 | $13,268,578 |
| 2004 | $228,812,363 | $207,069,179 | $22,010,988 |
| 2005 | $287,233,880 | $275,089,169 | $22,916,977 |

*Indicated amounts for 2000 and 2001 are rounded to the nearest thousand.

15    104.    In 2005, Le Nature's commenced operations at a new, 500,000 square foot state-of-

16  the-art facility in Phoenix, Arizona. The new facility substantially expanded Le Nature's'

17  production capacity, enabling (according to the Company) the production of 32 million more cases

18  per year. According to the Company, in a presentation that its executives and Wachovia

19  representatives made to potential lenders, by December 2005 Le Nature's had "expanded from 1

20  production facility with a total of 2 lines in 2003, to currently 2 production facilities with a total of

21  7 lines in operation."

22    105.    The reported financial information, as well as the news of expanded production

23  capacity and plans for additional facilities, falsely painted the picture of a booming company. In

24  May 2006, however, several minority shareholders in the Company – essentially, early investors

25  who provided seed capital in exchange for preferred shares of stock and representation on the

26  board of directors – initiated an action in Delaware Chancery Court against Le Nature's and four

27  of its inside directors (Podlucky, Jonathan Podlucky, Murin, and Lynn) (the "Delaware Action").

28  The Delaware Action involved various corporate governance disputes, including claims against

1  the inside directors for failing to actively maximize value and pursue a sale of the company in a

2  manner consistent with their fiduciary duties.

3      106.   In the Delaware Action, the minority preferred shareholders obtained several orders

4  prohibiting the inside directors from, *inter alia*, incurring non-ordinary capital expenditures and

5  performing certain actions without the board of directors' unanimous consent.  In June 2006, the

6  Chancery Court entered a preliminary injunction restraining the Company from taking certain

7  steps, such as making capital expenditures outside the ordinary course of business, without the

8  minority shareholders' approval.  On October 20, 2006, the Court issued an order prohibiting the

9  inside directors from accessing, tampering with, or destroying any Company property, books, or

10  records.

11      107.   Months after filing their initial complaint seeking the restraining order and the

12  appointment of a custodian to preserve Le Nature's' assets, the Company's minority preferred

13  shareholders were advised that, through the use of forged documents, Le Nature's had converted

14  funds placed on deposit by one of its lessors.  Specifically, AIG Commercial Equipment Finance,

15  Inc. ("AIG") had agreed to provide equipment lease financing for production lines at a planned

16  Florida facility.  To that end, in late 2005 and early 2006, AIG deposited approximately $26

17  million with Krones, Inc., the equipment manufacturer.  When AIG sent a representative to the

18  Krones plant to inspect the equipment, it learned that manufacturing had barely begun, and that

19  Krones had forwarded nearly $20 million of AIG's deposit to Le Nature's, supposedly based on

20  written instructions from AIG.  Having given no such instruction, AIG asked for copies of the

21  relevant documents.  Among other documents, Krones produced a letter, purportedly written on

22  AIG letterhead and purportedly signed by AIG, authorizing release of funds to Le Nature's.

23  According to AIG, the letter was a forgery, and AIG retained an expert opinion attesting to the

24  letter's falsification.

25      108.   Following revelation of the forgery, on October 27, 2006, the Delaware Chancery

26  Court approved the minority preferred shareholders' request for the appointment of a custodian

27  and appointed Kroll Zolfo Cooper ("KZC") as custodian for Le Nature's.  KZC took possession

28  and control of the company that same day at 5:30 p.m.  Over the next few days, several Company

1   employees informed KZC that they had witnessed individuals, including Podlucky, shredding

2   documents. An accounting employee advised KZC that false entries were made in order to meet

3   revenue targets and that the 2005 audited financial statements were based on falsified information.

4   KZC also was advised that over the weekend of October 21 and 22, 2006, a dump truck arrived at

5   the Company and unloaded a large volume of documents into the trash compactor, and that several

6   employees witnessed Podlucky's personal bodyguard depositing various bundles of documents

7   into the trash compactor.

8       109.   On November 1, 2006, Steven G. Panagos, a KZC managing director, filed an

9   affidavit with the Delaware Chancery Court detailing some of KZC's findings in its first few days

10  at Le Nature's. Among other things:

11  •   Information at the Company indicated that actual 2005 revenues were as low as $32
        million, as compared to the $275 million reported in Le Nature's' audited financial
12      statements;

13  •   Significant discrepancies existed between customer shipment and accounts receivable
        information located at the Company and the Company's (a) 2005 audited financial
14      statements, and (b) unaudited financial statements as of June 30, 2006;

15  •   Le Nature's had $1.8 million in available cash reserves, against which it had $2.9 million
        in outstanding checks; and
16
    •   Vendors were making demands on the Company for past due payments in excess of $10
17      million.

18
        110.   The custodian's findings clearly indicated that Le Nature's had engaged in massive
19
    overstatement of its revenues, not only for 2005 but for many years leading up to the Company's
20
    bankruptcy. The meager $32 million in revenues (as determined by the custodian) was achieved
21
    only *after* the Company brought into operation several of its production lines at the brand new
22
    Phoenix facility.
23
        111.   On November 1, 2006, several of Le Nature's' creditors initiated involuntary
24
    bankruptcy liquidation proceedings under Chapter 7 of the Bankruptcy Code. On November 3,
25
    2006, the Bankruptcy Court for the Western District of Pennsylvania put Le Nature's into chapter
26
    11 bankruptcy, thereby giving the Company an opportunity to reorganize.
27

28

112.    Almost immediately after the initiation of bankruptcy proceedings, Le Nature's ceased operations at its Phoenix facility.  On November 13, 2006, employees who reported to work at the Latrobe plant were sent home and told that the plant would be temporarily closed. Production never resumed.

113.    Since initiation of the bankruptcy proceedings, the chapter 11 trustee, together with his consultants and advisors, has initiated an intensive investigation regarding Le Nature's' actual revenues during the years 2002 through 2005.  The investigation, which is ongoing, has been more detailed than the preliminary investigation performed by the custodian.  In part, the investigation has been undertaken to submit amended tax returns for those years that reflect Le Nature's' actual revenues, rather than the inflated revenues reported by Le Nature's, Wachovia, and the company's auditors.  The results, which are reflected in signed tax returns submitted by the trustee, demonstrate the magnitude of the Company's revenues overstatements:

| Year | Le Nature's Reported Net Sales | Actual Net Sales (on tax returns) |
|------|-------------------------------|-----------------------------------|
| 2002 | $135,650,095 | $4,404,899 |
| 2003 | $155,746,687 | $9,812,559 |
| 2004 | $207,069,179 | $12,760,760 |
| 2005 | $275,089,169 | $28,284,230 |

Shown graphically:



21

COMPLAINT

114.    Facts that have been publicly revealed since the filing of Le Nature's' bankruptcy indicate that the Company's seemingly constant capital raising efforts, which purportedly were to generate funds to expand the Company's production and distribution lines, actually were undertaken to finance the extravagant lifestyles and bizarre spending habits of the Le Nature's Executives.  For example, upon information and belief, although Podlucky earned a salary of only $50,000, he was building a mansion worth in excess of $20 million.  Podlucky also purchased millions of dollars worth of jewelry, art, and toy trains with the Company's money.  The items that Podlucky purchased with money that he diverted from the Company – including the funds raised by sale of the Notes – included watches from Piaget, Harry Winston, Van Cleef & Arpels, and Rolex, necklaces and earrings containing diamonds, sapphires and other gems, and mounted and unmounted gems.  According to a complaint filed by the federal government, Podlucky transferred money from the Company's accounts to his personal accounts over a six-year period.

115.    Following the commencement of the Le Nature's bankruptcy proceedings, Le Nature's' website stated: "Le-Nature's has filed [for] bankruptcy and is no longer producing or selling its products. Unfortunately, the company is also unable to honor any promotions advertised online or elsewhere. We apologize for any inconvenience." The website is no longer operational.

**The Beginning of Wachovia's Symbiotic Relationship with Le Nature's: Transactions in 2003**

116.    Even before the Note Offering, Le Nature's commenced what would become a multi-year relationship with Wachovia, during which time Wachovia would serve as the exclusive financial advisor to, and investment banker for, Le Nature's.  In this role, Wachovia was responsible for arranging, funding, syndicating, and selling an array of credit facilities, all to raise more money to fund Le Nature's' purportedly expanding production and sales.  During the course of this relationship, Wachovia was also retained to explore a possible sale of the Company, a process through which it obtained even greater access to, and knowledge of, the Company's operations and finances (as well as bidders' reactions to the information they were provided).  As the result of its multiple roles, Wachovia was provided with access to Le Nature's' financial records, personnel, and outside accounting and legal firms.

22

**Exhibit A**
**Page 36**

COMPLAINT

**The First Step:  April 2003 Credit Facility**

1

2        117.    After hiring Grant Rice, the former Bank of America investment banker with ties to

3    Le Nature's, Wachovia moved quickly to seize Le Nature's as a client.  In April 2003, Wachovia

4    was the co-lead arranger for a $150 million credit facility for Le Nature's (the "April 2003 Credit

5    Facility").  Wachovia Bank acted as the administrative agent.  As set forth below, the April 2003

6    Credit Facility was repaid only two months later with funds raised, again by Wachovia, in the

7    Note Offering.  With the April 2003 Credit Facility, Wachovia got its foot in the door, enabling it

8    to take steps to further enhance its limited presence in the high yield market.

**Wachovia Breaks Further into the High Yield Market with the June 2003 Note Offering**

9

10        118.    In June 2003, Wachovia arranged the issuance and placement, and acted as the

11    initial purchaser, of the $150 million Note Offering.  The proceeds of the Note Offering were used

12    to satisfy Le Nature's' obligations under the April 2003 Credit Facility.

13        119.    Wachovia marketed the Note Offering to investors through (i) a detailed Offering

14    Memorandum drafted by Wachovia and bearing the "Wachovia Securities" name on its cover, (ii)

15    in-person "road show" presentations along with Le Nature's management, and (iii) telephone

16    conferences, direct phone calls, and e-mails to investors.

17        120.    The relationship between Wachovia and Le Nature's was unusual in that Wachovia

18    screened all information distributed by the Company to the Noteholders.  Income statements,

19    balance sheets, cash flow statements, and other reports containing financial information, were all

20    distributed first to Wachovia, and then to Noteholders by Wachovia.  In a typical deal, all

21    investors, including the underwriter, would see this type of information at the same time.  Some of

22    the Noteholders complained that they were getting the information a day late from Wachovia, but

23    Wachovia insisted on controlling the information flow.  All correspondence between Le Nature's

24    and the Noteholders ran through Wachovia.

25        121.    By the time of the Note Offering, Wachovia knew that Le Nature's was a troubled

26    company.  Motivated by (i) fees to be generated by the Note Offering, (ii) the solidification of an

27    on-going investment banking relationship with Le Nature's, and (iii) relief of the credit exposure

28    that its affiliate, Wachovia Bank, had incurred under the April 2003 Credit Facility, however,

1  Wachovia pressed forward with the Note Offering.  The result was placement of the Notes with an

2  array of investors who would fall victim to Le Nature's' fraud, including Plaintiffs herein.

3  122.  One of Wachovia's principal motivations for participating in Le Nature's' fraud,

4  and facilitating placement of the Notes, was its strong desire to build up its fledgling high-yield

5  bond business, which was dependent on generating financing transactions for mid-market

6  companies such as Le Nature's.  In early 2003, Wachovia was still a comparatively new player in

7  the high-yield underwriting business.  In 2000, Wachovia underwrote only one issue.  In 2001 and

8  2002, it underwrote only four and 10 issues (respectively), increasing the total issue amount from

9  $200 million in 2000 to $476.6 million in 2001 and $960.3 million in 2002.  In 2003, the year of

10  the Le Nature's Note Offering, Wachovia underwrote considerably more: 38 issues valued at $2.7

11  billion, earning fees of $58 million (up from $23 million in 2002, $9.9 million in 2001, and $4

12  million in 2000).  Compared to other investment banks, however, Wachovia remained a minor

13  player in the sector.  In 2003 alone, for example, Credit Suisse First Boston ("CSFB") underwrote

14  127 issues, valued at more than $21.6 billion.

15  123.  Struggling to compete with more established investment banks, Wachovia was not

16  as selective in choosing which high-yield issuances to pursue.  Large and more established bond

17  issuers were unlikely to choose a fledgling underwriter like Wachovia.  As a result, Wachovia

18  sought to expand its high-yield underwriting business through *quantity*, rather than quality, and

19  was willing to underwrite deals that other banks were not even willing to consider.  The Le

20  Nature's Note Offering was just such a deal.  In May 2003, Wachovia's High-Yield Capital

21  Markets Division (the "Origination Division"), which acted as an investment bank charged with

22  originating and underwriting investment opportunities, approached its publicly trading

23  counterpart, the High-Yield Sales (Trading and Research) Division (the "Sales Division"), with

24  the Le Nature's transaction.  On information and belief, within Wachovia, the Sales Division

25  expressed misgivings about the Note Offering, specifically questioning the accuracy of Le

26  Nature's' recent sales trajectory.  Moreover, a senior Wachovia executive had warned at the time

27  that the Company "had hair on it" – a colloquial term indicating challenges at Le Nature's.

28  Indeed, Le Nature's had serious financial and management integrity issues.  As one former

1    member of the Sales Division acknowledged, the Sales Division was very concerned about

2    moving forward with the transaction and hoped that it would simply "go away."

3        124.    In light of its concerns, the Sales Division tried to push off the transaction by

4    advising the Origination Division that, based on its review of the Note Offering, it believed

5    additional due diligence was needed. The Origination Division, hungry to complete the

6    transaction and further cement Wachovia's relationship with Le Nature's, advised the Sales

7    Division simply to trust the Origination Division's due diligence and move forward in selling the

8    Notes.

9        125.    As a result, on information and belief, Wachovia pushed forward with the Note

10   Offering even though it was well aware that additional due diligence, requested by its own Sales

11   Division, had not been done. And lack of due diligence was only part of the picture. Even in

12   early 2003, Wachovia had direct information about the troubled state of affairs at Le Nature's.

13   Grant Rice, who had joined Wachovia from Bank of America, was a senior manager and

14   Wachovia's principal contact with Le Nature's. Like Wachovia, Bank of America considered the

15   possibility of raising financing for Le Nature's. On information and belief, that bank, unlike

16   Wachovia, cut off its efforts based on its distrust of the Company and the Company's lack of

17   openness in the due diligence process. Bank of America recognized that Le Nature's

18   management could not be trusted, and thus that a financing transaction should not be completed.

19   Rice arrived at Wachovia armed with the knowledge that Le Nature's' managers lacked integrity.

20   But he brought Le Nature's with him as a client, and worked with fellow Wachovia employees to

21   complete the Note Offering, knowing all along that his former employer was unwilling to

22   complete a transaction with Le Nature's because of the financial integrity issues it had identified.

23       126.    After the Note Offering closed, Podlucky inexplicably agreed to increase

24   Wachovia's fee for underwriting the Note Offering to 4%, notwithstanding the fact that Wachovia

25   had agreed to underwrite the Offering for 2.75%. In dollar terms, the unexplained increase in

26   Wachovia's fee amounted to a $1.8 million reward for Wachovia.

27

28

**The Offering Memorandum**

127.    The Offering Memorandum that Wachovia drafted and distributed to potential

investors in the Note Offering was riddled with material misstatements, exaggerating, among other

things, Le Nature's' sales amounts and profit levels.  Driven by the Origination Division's desire

to press forward without any meaningful due diligence, and casting aside the warnings that

Wachovia already had received regarding the lack of reliability of Le Nature's' reported finances

and management's lack of integrity, Wachovia published these false statements to induce investors

to purchase the Notes.

128.    Among multiple other misstatements, the Offering Memorandum included the

following materially false and misleading statements:

- From 1998 to 2003, net sales grew at a compounded annual growth rate of 63.1%.  For the twelve months ended March 31, 2003, the Company generated net sales and EBITDA of $145.0 million and $55.2 million, respectively, resulting in an EBITDA margin of 38.1%.

- Net sales grew from $19.2 million in 1998 to $135.7 million in 2002.

- Le Nature's' gross sales for 2000, 2001 and 2002 were, respectively, $40.658 million, $85.094 million and $143.767 million.

- Gross sales increased 41.2% from the first three months of 2002 to the first three months of 2003.  The increase was attributed to (i) a 96.3% increase in case sales of bottled products (an increase of 2.2 million cases sold to 4.5 million cases sold in the first quarter 2003) and (ii) a 14.0% increase in sales of tea concentrate and blended tealeaves to industrial customers.

- Gross sales for the year ended December 31, 2002 increased by $58.7 million, or 69.0%, to $143.8 million, as compared to $85.1 million for the year ended December 31, 2001.  The increase in gross sales was attributed to (i) a 46.7% increase in sales of tea concentrate and blended tealeaves to industrial customers and (ii) a 90.3% increase in case sales of our bottled products (an increase of 8.4 million cases sold to 17.8 million cases sold in 2002).

- Gross sales for the year ended December 31, 2001 increased by $44.4 million, or approximately 109.3%, to $85.1 million, as compared to $40.7 million for the year ended December 31, 2000.

- Le Nature's' had $6.307 million and $5.136 million deposited with its tealeaf supplier at the end of 2001 and 2002, respectively.

- For the twelve-month period ended March 31, 2003, gross sales of bulk tea concentrate were $31.5 million, representing 20.5% of total gross sales.  During the same period, gross sales of packaged bulk tealeaves were $23.7 million, representing 15.4% of total gross sales.

Exhibit A
Page 39a

1      129.    Given Le Nature's' actual sales and bulk tea transactions for the years 2000-02, as

2 determined by the chapter 11 trustee, all of the information set forth above was materially

3 incorrect and misleading when it was distributed to investors.

4 **The Contemporaneous June 2003 Credit Facility**

5      130.    Coupled with the Note Offering, Wachovia arranged a replacement $100 million

6 credit facility in June 2003.  Wachovia was the sole lead arranger and bookrunner.  And, once

7 again, its affiliate, Wachovia Bank, served as administrative agent for a fee.  Wachovia syndicated

8 the $100 million credit facility – which consisted of a $100 million revolving line of credit senior

9 to the bonds – to multiple lenders.

10      131.    As demonstrated by the several transactions that Wachovia arranged in early 2003,

11 from the very outset of its relationship with Le Nature's, Wachovia turned a blind eye to Le

12 Nature's' substantial infirmities in order to obtain massive fees, generate substantial public

13 exposure, and develop its high-yield banking business.  Indeed, in a widely circulated e-mail of

14 July 1, 2003, Wachovia's bankers congratulated themselves on their close relationship with Le

15 Nature's' management, and celebrated the fees and publicity generated by that relationship.  The

16 e-mail also highlighted Wachovia's ability to purposefully ignore "internal issues," such as the

17 integrity and due diligence issues raised by its Sales Division, in order to achieve such results.  As

18 the e-mail makes clear, Wachovia was willing to sacrifice its own integrity, and adapt to Le

19 Nature's' "ever-changing" deal, in order to promote its own business and financial success:

20             . . . . The recent transaction is receiving a lot of publicity here in
                Charlotte and everyone is aware that the recent bank/bond deal

21             would not have happened without our prior support of the company
                via the previous bank deal and the rapport developed with

22             management in the process. . . . As a result of your ability to adapt
                to an *ever-changing deal* and willingness to work in concert with

23             CIB [a division within Wachovia], we have recognized *total fees of
                nearly $7.5MM* between the two bank deals and the high yield

24             issuance.  *This deal has become a poster child for what we can get
                done when we don't get hung up on internal issues* and do what is

25             best for the client and our firm as a whole.

26

27

28

COMPLAINT

1    <u>E&Y's Woeful Audits Mislead the Noteholders</u>

2    **1)      *E&Y's Audits Were Prepared Specifically for the Note Offering***

3    132.    In 2002, Le Nature's retained E&Y to act as its independent auditor. E&Y audited

4    Le Nature's' 2002 financial statements and re-audited the Company's 2000 and 2001 statements,

5    as the Company specifically requested that it do in advance of the Note Offering. E&Y purported

6    to conduct the audits in accordance with auditing standards generally accepted in the United States

7    ("GAAS"). Le Nature's also engaged E&Y to perform tax advisory services for the Company. Le

8    Nature's purposefully sought out E&Y, one of the country's biggest and most well-known

9    auditing firms, so that potential investors in the Company would take comfort in the apparent

10   credibility of the Company's financial statements.

11   133.    E&Y understood that the very purpose of its audit work was to provide audited

12   financials in connection with the Note Offering. Indeed, while E&Y was retained to perform its

13   audit of the 2002 financials on August 19, 2002, it was retained to reaudit the Company's 2000

14   and 2001 financial statements on February 3, 2003, shortly before the Offering Memorandum was

15   completed and distributed. E&Y's audit report, together with the accompanying financial

16   statements for 2000, 2001, and 2002, were appended directly to the Offering Memorandum for the

17   Note Offering. Additionally, financial information drawn from and specifically referencing the

18   audited financial statements was peppered throughout the Offering Memorandum that was

19   provided to potential purchasers.

20   134.    E&Y knew that potential purchasers of the Notes would rely on the financial

21   statements and E&Y's audit report in evaluating the Company and determining whether to

22   purchase the Notes.

23   **2)      *The Requirements of GAAS***

24   135.    To conduct an audit in compliance with GAAS, an auditor is not permitted to

25   simply accept financial information provided to it by its client. Rather, as set forth in the

26   codification of auditing standards by the American Institute of Certified Public Accountants

27   ("AICPA"), an "auditor has a responsibility to plan and perform the audit to obtain reasonable

28   assurance about whether the financial statements are free of material misstatement, whether

**Exhibit A**

**Page 41**

COMPLAINT

1 caused by error or fraud." (AU § 110.02) (Citations to "AU" refer to the codification assembled

2 by the AICPA.) "The independent auditor's objective is to obtain sufficient competent evidential

3 matter to provide him or her with a reasonable basis for forming an opinion." (AU § 230.11)

4      136.   In addition, due professional care requires the auditor to exercise professional

5 skepticism, defined as "an attitude that includes a questioning mind and a critical assessment of

6 audit evidence. . . . Gathering and objectively evaluating audit evidence requires the auditor to

7 consider the competency and sufficiency of the evidence. . . . [T]he auditor should not be satisfied

8 with less than persuasive evidence because of a belief that management is honest." (AU § 230.07-

9 .09)

10      137.   Auditors are also required to assess the risk of material misstatement of the

11 financial statements due to fraud. (AU § 316) An example of the exercise of professional

12 skepticism in response to the assessed risk of fraud is the "increased recognition of the need to

13 corroborate management explanations or representations concerning material matters – such as

14 further analytical procedures, examination of documentation, or discussion with others within or

15 outside the entity." (AU § 316.27) Based upon the auditor's assessment of the risk of fraud:

16      The *nature* of auditing procedures performed may need to be
17 changed to obtain evidence that is more reliable or to obtain additional corroborative information. For example, more evidential
18 matter may be needed from independent sources outside the entity. Also, physical observation or inspection of certain assets may
19 become more important. . . . The *extent* of the procedures applied should reflect the assessment of the risk of material misstatement
20 due to fraud. For example, increased sample sizes or more extensive analytical procedures may be appropriate. (AU § 316.28)

22      138.   The requirements for assessing the risk of fraud are especially important for a

23 company such as Le Nature's, where the CEO exercised exclusive control over many aspects of

24 the Company's finances. Auditors are required to take various fraud risk factors into

25 consideration in planning the audit. Among the factors indicating the possible existence of fraud

26 are the "domination of management by a single person or small group without compensating

27 controls," and "[u]nusually rapid growth or profitability." (AU § 316.17) Management of a small

1    entity with unusually rapid growth or profitability may be motivated to avoid an interruption in its

2    growth trends, especially compared with others in its industry.  (AU § 316.15)

3         139.    Auditors are also required to be familiar with the business of the company they are

4    auditing and the industry within which the company operates.  "The auditor should obtain a level

5    of knowledge of the entity's business that will enable him to plan and perform his audit in

6    accordance with generally accepted auditing standards." (AU § 311.06)  Among other things, an

7    auditor should have sufficient knowledge to understand "the events, transactions, and practices

8    that . . . may have a significant effect on the financial statements." (Id.)  Such knowledge of the

9    business assists an auditor in, among other things, valuing a company's inventories.  (Id.)

10        140.    An auditor's knowledge should extend beyond the company being audited to

11   include "matters affecting the industry in which the company operates." (AU § 311.07)  Industry

12   knowledge includes an understanding of "economic conditions" within the industry.  (Id.)  An

13   auditor should be familiar with standard market prices for major inputs used by the company in

14   producing its goods.

15        *3)    E&Y Knew that Le Nature's Required "Close Monitoring," Yet It Chose Not
              to Implement Adequate Testing Procedures*

16

17        141.    E&Y knew that, to complete a GAAS-compliant audit of Le Nature's, it would

18   have to undertake enhanced audit procedures.  E&Y knew that Le Nature's presented atypical

19   risks mandating the use of such procedures.  Rather than taking more steps to ensure the accuracy

20   of its audit, however, E&Y chose to limit audit procedures such that its audit would fail to

21   comply with GAAS under any circumstances.

22        142.    E&Y had several bases for requiring enhanced audit procedures.  Most

23   significantly, E&Y knew that Podlucky had control over all phases of the Company's operations

24   and was involved in all areas of the accounting process with no effective segregation of duties.

25   E&Y knew that Podlucky made all key financial decisions for the Company, and was integrally

26   involved in day-to-day financial operations.  It is highly unusual for the CEO to be so directly

27   involved in routine accounting functions, or to exercise such control over access to financial

28   information.

143.   E&Y's audit revealed the extent of Podlucky's unusual involvement and the Company's failure to segregate financial decision-making and review functions. Podlucky performed a wide array of financial functions at the company, even controlling access to key data files.

144.   E&Y's review of the Company's segregation of duties must have indicated a pervasive lack of adequate segregation. E&Y was aware, accordingly, that Podlucky could single-handedly influence or manipulate the Company's financial results or the constituent elements thereof.

a)     E&Y Did Not Perform an Adequate Test of Controls

145.   E&Y planned to test and rely upon controls for at least part of its audit assurance. Given the weaknesses in internal controls that existed at Le Nature's, it was not appropriate for E&Y to have relied upon internal controls as a means of reducing reliance on substantive audit procedures. Moreover, E&Y's tests of controls were wholly insufficient. On information and belief, E&Y did not test controls for tea sales, even though tea sales made up a significant portion of Le Nature's' total revenues *and* differed substantially from sales of beverages. The tea sales were not routine, were not subject to the same control processes, and were arranged and documented by Podlucky alone. Failure to test controls for this significant portion of Le Nature's' business fundamentally undermined the effectiveness of any revenues controls testing.

146.   On information and belief, E&Y's testing was equally flawed on the expenditures side. E&Y's failure to properly test controls directly contravened its plan to test controls, rely upon them, and plan the nature, extent, and timing of its substantive audit procedures based on those controls.

b)     E&Y Was Required to Perform Substantive Tests of Revenues and Expenditures, Yet Did Not Do So

147.   Having failed even to test the adequacy of Le Nature's' controls, E&Y was in no position to rely upon those controls in place of substantive testing. But E&Y did something far worse. On information and belief, more than just adjusting the level of substantive testing, E&Y abandoned substantive tests altogether. Whether or not E&Y's tests of controls were adequate --

31

COMPLAINT

1   which, under the circumstances, they were not – a failure to perform any substantive tests of Le

2   Nature's' revenues and expenditures would be a straightforward violation of GAAS.

3       148.    As an initial matter, given the absence of effective controls over revenues and

4   expenditures, E&Y should have assessed control risk at the maximum level, placed no reliance on

5   controls, and obtained all of its audit assurance from the performance of substantive procedures.

6   Because of the high control risk of material misstatement, E&Y should have modified its

7   procedures to obtain *more* persuasive evidence.  On information and belief, however, E&Y did

8   exactly the opposite – it failed to perform testing that would be required even if controls were

9   determined to be reliable.  *Without having performed substantive audit procedures for revenues,*

10  *given the significance of revenues to Le Nature's' financial statements, E&Y lacked sufficient*

11  *basis for its audit report.*

12      149.    Given the significant risks associated with the Le Nature's audit engagement and

13  the concentration of revenues with a few large customers, the most appropriate audit procedure

14  would have been the confirmation of recorded sales amounts directly with the largest customers.

15  This would have provided independent evidence from outside the Company.   On information and

16  belief, however, E&Y did not either seek or obtain outside confirmations of sales from any of Le

17  Nature's' customers.

18      *4)     E&Y Approved Inventory Amounts Based on Grossly Misstated Tea Prices*

19      150.    At year-end 2002, Le Nature's reported – and E&Y ratified in the audited financial

20  statements appended to the Offering Memorandum – raw material inventories of $10.95 million.

21  Of that amount, more than $9 million was attributable to tealeaf inventories.  Le Nature's

22  calculated the value of the tealeaf inventory by applying a purported purchase price of $19.22 per

23  pound.  In fact, however, Le Nature's paid between $0.60 and $0.65 per pound. *The vast bulk of*

24  *the inventory, accordingly, was overstated by more than 2800%.*

25      151.    As Le Nature's' independent auditor, E&Y was required by GAAS to be familiar

26  with the business and the industry within which the Company operated.  E&Y's facile

27  documentation of the grossly inflated $19.22 per pound purchase and inventory price, and the

28

COMPLAINT

1  resulting inflated inventory levels, however, demonstrates that E&Y either had *no familiarity* with

2  the industry or was willing to overlook an obviously incorrect and inflated price.

3      152.    Le Nature's actually paid less than one dollar per pound for the bulk tealeaf that it

4  purchased.  The price that Le Nature's paid was consistent with the wholesale market price for

5  bulk tealeaf purchases at that time.  If E&Y were familiar with the industry, it would have known

6  that $1.00 per pound (or less) – not more than $19 per pound – was a reasonable and customary

7  price for bulk tealeaf.  Moreover, the price that E&Y used is actually higher than the *retail* price

8  for tea.  Individually-packaged, consumer-oriented Chinese black tea is widely available for less

9  than $6.00 per pound (in packages as small as two pounds).  Bulk tea, purchased in quantities

10  exceeding 250,000 pounds, can be purchased for a small fraction of that price.

11      153.    E&Y knew of the vast overstatement and failed to disclose it, or alternatively was

12  either grossly negligent or reckless in failing to uncover the massive price inflation.

13      154.    In addition to massively overstating tealeaf inventory, Le Nature's' audited

14  financials included, as a current asset, a deposit of more than $5 million for additional tealeaf to be

15  delivered.  Like the value of the existing inventory, the amount of the deposit – if it was ever made

16  at all – was grossly overstated.  *At a minimum*, the deposit amount – which itself accounted for

17  more than 16% of *all* of Le Nature's' reported current assets – was overstated to the same

18  egregious degree as the inventory valuation; i.e., by at least 2800%.

19      155.    As Le Nature's' former chief financial officer explained, Le Nature's had received

20  invoices for bulk tea sales (such as the invoice for this deposit) from Ritz Foods, a tealeaf supplier,

21  that appeared to be manually typed on an invoice form from American Brewing, a bulk tea

22  customer.  E&Y never attempted to determine why such large and important transactions were

23  reflected on non-standard documents purportedly issued by one of Le Nature's' major customers.

24      156.    E&Y's use of flawed evidential matter to support the tea inventories and a deposit

25  at prices more than 25 times the amount paid by Le Nature's resulted in massively overstated

26  inventories and materially misstated financial statements.  E&Y's failure to undertake any

27  meaningful corroboration of the concededly significant purchases and deposit was in violation of

28  GAAS.

5)   **E&Y's Audit of the Company's Assets and Liabilities Was Materially Flawed**

a)   **Accounts Receivable**

157.   On information and belief, E&Y did not receive responses to its inquiries to Le Nature's' customers, and thus was unable to confirm outstanding receivable balances. Given the significance of Le Nature's' largest customers to the Company, had the receivable balances been legitimate, Le Nature's' management should have been in a position to persuade at least some of these customers to return the confirmations. At a minimum, E&Y should have pursued additional efforts to obtain responses to its confirmation requests. In the absence of responses, the required professional skepticism should, at a minimum, have caused E&Y to question the legitimacy of the balances.

158.   Moreover, E&Y should have undertaken additional procedures because total amounts reflected on customer invoices were nearly all identical for certain customers. On information and belief, the recurring amounts on the invoices was the direct result of fraud. On information and belief, Podlucky created multiple invoices corresponding to single shipments, thereby generating false receivables. When those invoices were paid – typically with funds from an outside account set up by Podlucky to perpetuate the fraud – the fake and repetitive invoices resulted in false and substantially inflated revenues. Had E&Y properly audited the receivables, and thus exposed their fraudulent and redundant nature, the massive overstatement of revenues would have been revealed.

b)   **Accounts Payable**

159.   On information and belief, E&Y encountered an unusually high rate of error in testing the Company's disbursements. E&Y should have extended its testing to address this risk indicated by this high rate of error. Once again, however, E&Y failed to exercise the mandated professional skepticism by extending the scope of its testing. E&Y simply relied on its initial findings, including its reliance on the Company's internal controls, rather than conducting a sufficient examination of the accounts payable.

1        *6)    E&Y Knew that Le Nature's Could Not Keep Current with Its Obligations*

2        **a)    Undisclosed Failures to Satisfy Lease and Debt Obligations**

3        160.   On information and belief, E&Y's audit revealed that Le Nature's was delinquent

4    in the payment of lease obligations.  Failure to make timely payments raised an obvious question

5    with respect to LeNature's' liquidity and ability to meet its obligations and continue as a going

6    concern.  On information and belief, however, E&Y did not adjust or expand its audit procedures.

7        161.   Le Nature's' defaults on its lease obligations was especially problematic given the

8    high rate of growth in sales and profits that Le Nature's had reported (reported net income had

9    grown from $1.3 million in 2001 to $9.5 million in 2002).  Le Nature's' inability to maintain its

10   financial covenants after having achieved this dramatic growth in claimed profitability meant that

11   meeting these covenants would be difficult in the future, especially in light of the planned increase

12   in financing (the purpose for which E&Y was undertaking the audits).

13       **b)    Le Nature's Was Not Paying All of Its Federal and State Taxes**

14       162. .   In addition to serving as Le Nature's's outside auditor, E&Y was retained to provide

15   tax advice to Le Nature's.  As the result of its role as tax advisor, E&Y was aware that Le Nature's

16   was not paying all of its taxes, that the Company was incapable of paying its taxes, and that the

17   Company was incurring substantial penalties because of its inability to pay the taxes that were

18   due.

19       163.   On March 14, 2003 – well before E&Y issued its audit report for 2002 – an E&Y

20   tax partner sent a letter to Le Nature's' chief financial officer explaining the Company's tax

21   situation.  The letter indicated that planned tax payments for Le Nature's included federal

22   penalties and interest of $250,000 and state penalties and interest of $60,000 based on Le

23   Nature's' inability to timely pay its taxes.  The letter further explained: "Per your request, we

24   have included preprinted blank extensions for your completion.  *It is our understanding that*

25   *based on your current cash position, you will be unable to make these payments in full.*"

26       164.   Accordingly, when it issued its audit report, E&Y knew that Le Nature's lacked

27   sufficient cash to meet its current obligations, *including the Company's federal and state tax*

28   *liabilities.*  Like the Company's inability to satisfy lease and debt obligations, this cash flow

1  problem was especially alarming in light of the Company's reported financial results, which

2  reflected substantially increased profits and sales.  Indeed, in light of the reported results, Le

3  Nature's' inability to satisfy its obligations – without incurring additional debt and thereby

4  exacerbating its problems – called into question the Company's ability to continue as a going

5  concern, and should have caused E&Y further to question the legitimacy of the reported financial

6  results.

7        **7)    E&Y Confirmed Grossly Incorrect Financials**

8        165.    E&Y's multiple failures to comply with GAAS – including its apparent inability to

9  exercise the professional skepticism required of auditors – led to E&Y's issuance of an unqualified

10  audit report for financial statements that were dramatically misstated.  E&Y's (i) failure to obtain

11  outside, independent, corroborative materials, (ii) acceptance of Podlucky's manufactured

12  evidence, notwithstanding its knowledge of his dominant control over the Company's finances,

13  (iii) acceptance of the adequacy of the Company's controls, without even testing them, (iv)

14  reliance on controls to limit – indeed, to omit altogether – substantive testing of revenues and

15  expenses, and (v) failure to implement appropriate audit procedures in response to clear

16  indications of financial problems at the Company, all contributed to E&Y's ultimate certification

17  of misleading and materially false financial statements.

18        166.    After only a few days at Le Nature's, the court-appointed custodian was able to

19  determine that the Company's revenues were vastly overstated.  The chapter 11 trustee has

20  determined, after a more detailed investigation, that Le Nature's' net sales in 2002 were no greater

21  than $4.4 million.  Accordingly, the trustee reported those revenues on the Company's amended

22  tax returns.  E&Y, in stark contrast, issued its clean audit report with respect to financial

23  statements indicating 2002 net sales of $135.7 million.

24        167.    The overstatement of revenues enabled and approved by E&Y's inadequate audit

25  was, to say the least, dramatic.  Reported net sales were more than 3000% of actual net sales, a

26  degree of misstatement that could not possibly result from negligence alone.  For an auditor to

27  permit such vast overstatement of revenues, it must – as E&Y did here – ignore obvious red flags

28  of fraud, and issue a clean audit report notwithstanding an utter failure to test the subject

1  company's true controls or to perform substantive testing of the company's reported financial

2  results.

3  **The Events of July 2003:  Le Nature's' Key Financial Managers**
**Identify Fraud at the Company**

4

5      168.    On August 14, 2003, shortly after Wachovia completed Le Nature's' $150 million

6  Notes Offering and new $100 million credit facility, John Higbee, Le Nature's' chief financial

7  officer, abruptly resigned.  Higbee was a veteran auditor – with more than 20 years of experience

8  as an audit partner at Arthur Andersen – who was hired by Le Nature's in 2002 to provide

9  legitimacy to Le Nature's' financial management team.  Before joining Le Nature's, Higbee had

10 been a member of the Arthur Andersen team that audited Le Nature's' financial statements and

11 had done independent consulting work for Le Nature's.  E&Y knew all of this.

12     169.    In his detailed resignation letter, Higbee explained that he repeatedly had requested

13 direct access to the Company's general ledger detail.  As set forth in the letter, however, Podlucky

14 refused to grant Higbee access to the general ledger, a remarkable position for any chief executive

15 to take with respect to a company's chief financial officer.  Among other things, Higbee further

16 explained that Podlucky's completion of business transactions "without any normal review by

17 others, such as the CFO," had made it impossible for Higbee to fulfill his responsibilities to the

18 Company.  Higbee concluded his letter by explaining the complete control – and the impropriety

19 of such complete control – that Podlucky exercised over Le Nature's:

20              I consider 1) *the absolute control you maintain over the*
                *Company's detail financial records* 2) the *lack of checks and*
21              *balances* related to deposits on equipment 3) the *lack of checks and*
                *balances* related to deposits on tea leaf 4) the *lack of checks and*
22              *balances* related to the sale of bulk tea concentrate and bulk tea leaf
                to be *material weaknesses in the Company's internal controls.*
23

24     170.    Higbee was not alone in his concerns and his willingness to express them.  The

25 same day, Jennifer Fabry, the Company's chief administrative officer (who had recently been

26 given the title of chief financial officer in Higbee's place), and Stacy Juchno, the vice president of

27 administration, submitted their resignations.  Both Fabry and Juchno wrote, *"I have seen*

28 *inconsistencies with how business is conducted and do not agree with such behavior."*

1        171.    Higbee alerted the Company's auditors at E&Y to the resignations.  In a letter to

2    Podlucky dated August 22, 2003, E&Y requested that the Company "engage immediately

3    competent independent legal counsel to conduct a thorough and complete investigation of the.

4    allegations made by the former employees."  E&Y further explained that it would be *"unable to

5    be associated with* any unaudited interim financial statements or *historical audited financial*

6    *statements,* including issuing any consents or comfort letters, until the allegations are investigated

7    thoroughly by independent counsel, we complete our review of the report of the investigation, we

8    perform any additional procedures we consider necessary in the circumstances, and we interview

9    the former employees."  E&Y, however, failed to make any disclosure that its audit report and the

10   accompanying financial statements should not be relied upon.

11       172.    In response, Le Nature's purported to appoint a special committee of its board of

12   directors (the "Special Committee") to investigate certain business transactions identified by

13   Higbee, Fabry, and Juchno.  The committee, in turn, retained the law firm Kirkpatrick & Lockhart

14   LLP ("K&L") to conduct the investigation.  Both the Special Committee and K&L, while

15   purporting to conduct an independent investigation, limited the scope of the investigation to seven

16   specific transactions identified by the resigning managers.  With respect to these transactions, the

17   resigning employees had expressed their concerns that:

18   •      Podlucky exercised exclusive control over significant aspects of Le Nature's' business,
         including equipment deposits and purchases, the purchase of tealeaf, and the sale of Bulk
19       Tea Products;

20   •      Podlucky refused to explain his relationship with Lawrence Wooten, who they suspected
         controlled both (i) the sole supplier of tealeaf to Le Nature's, and (ii) Le Nature's'
21       principal purchasers of Bulk Tea Products; and

22   •      Podlucky's flamboyant lifestyle was not consistent with his purported annual income of
         $50,000.
23

24       173.    K&L's resulting report (the "Report") demonstrates that the law firm, while

25   purporting to be an "independent" examiner of the resigning managers' allegations, was beholden

26   to the corrupt management that had hired it and thus failed to conduct an adequate investigation.

27   The Report repeatedly noted the unavailability of supporting information and documentation, the

28   lack of Le Nature's' (and, specifically, Podlucky's) cooperation, and the insufficiency of Le

1   Nature's' almost nonexistent internal financial controls.  Among other things, the Report revealed

2   the following startling facts, all of which provide a glimpse into the perverse way in which Le

3   Nature's was being managed:

4   •   Andrew Murin (formerly president of Le Nature's) and Edward Reeves (the owner of the
        sole supplier of tealeaf to Le Nature's) were not "forthcoming" in their interviews.  When
5       K&L requested an opportunity to interview each of them again, "Le-Nature's refused to
        make either individual available."

6
    •   "In many instances, Counsel was unable to obtain external supporting documentation
7       relating to the Bulk Tea Products transactions reviewed by it.  This is *particularly
        problematic* in view of the substance of the interviews of Messrs. Murin and Reeves."

8
    •   Counsel sought to interview Lawrence Wooten, the owner of Le Nature's' principal Bulk
9       Tea Products customer.  In the first half of 2003, Wooten's companies supposedly
        purchased $34.2 million of such products from Le Nature's and received trade credits of
10      $3.95 million that were approved by Podlucky *without any involvement of any other Le
        Nature's employee*.  Wooten declined to be interviewed.

11
    •   Le Nature's did not enable Counsel to interview a representative of Vistar, a substantial Le
12      Nature's customer that received a large refund for tea concentrate in the first half of 2003.

13  •   Le Nature's inexplicably agreed to increase Wachovia's fee in connection with the June
        2003 Notes Offering even though the offering was "oversubscribed at the time of
14      Wachovia Securities' proposal to revise the fee."

15  •   Le Nature's was unable to provide reliable documentation "evidencing the shipping or
        receiving" of bartered items.

16
    •   "Counsel was unable to independently verify receipts and shipments related to Le-Nature's
17      reported purchases of tealeaf and sales of Bulk Tea Products because the third party
        documents reflecting these transactions are illegible, unreliable, or non-existent."

18

19      174.   Among the many other deficiencies in the Report, K&L utterly failed to obtain

20  supporting documentation and information concerning bulk tea concentrate and bulk tealeaf sales.

21  Documents were missing, key customers (with connections to Podlucky) refused to be

22  interviewed, and receipts and shipments could not be verified.  The insufficiency of the Report in

23  this regard is jarring, given that problems in this specific area were identified by Higbee in his

24  resignation letter.  Indeed, even K&L recognized that "there are significant internal control

25  weaknesses relating to the tealeaf inventory, including the lack of valid third party shipping

26  documents and inadequate segregation of duties."  But based on its determination that Podlucky's

27  "explanation for Le-Nature's Bulk Tea Product activity" was "plausible," K&L concluded that Le

28  Nature's' bulk tea sales and purchases were sufficiently identified.

Exhibit A
Page 52

COMPLAINT